**NEW YORK PUBLIC INTEREST RESEARCH GROUP, INC.,** Petitioner,

v.

**Stephen L. JOHNSON, in his capacity as Administrator, United States Environmental Protection Agency ✻ Respondent.**

**No. 03–40846(L), 03–40848(CON).**

United States Court of Appeals, Second Circuit.

Argued: March 2, 2005.

Decided: Oct. 24, 2005.

---

✻ Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Stephen L. Johnson, Administrator, United States Environmental Protec-

tion Agency, is substituted as Respondent in this case.

Keri N. Powell, (Stephen E. Roady on the brief), Earthjustice, Washington, DC, for Petitioner New York Public Interest Research Group.

Daniel R. Dertke, Environmental Defense Section, Environmental & Natural Resources Division (Thomas L. Sansonetti, Assistant Attorney General; John C. Cruden, Deputy Assistant Attorney General, Environmental & Natural Resources Division, on the brief), Washington, DC, for Respondent Stephen L. Johnson, in his capacity as Administrator, United States Environmental Protection Agency.

Norman Spiegel, Chief, General Litigation Division, Office of the Attorney General (Eliot L. Spitzer, Attorney General of the State of New York, Robert H. Easton, Assistant Solicitor General, Gordon J. Johnson, on the brief), New York, NY, for Intervenor New York State Department of Environmental Conservation.

William M. Bumpers, (Stephen L. Braga, Debra J. Jezouit, on the brief), Baker Botts LLP, Washington, D.C., for Intervenor NRG Energy, Inc.

Before: CALABRESI, POOLER, and B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

This proceeding challenges the Environmental Protection Agency's ("EPA") refusal to object to Clean Air Act (the "Act") operating permits issued by the New York State Department of Environmental Conservation ("DEC") to the Huntley and Dunkirk power plants, two of New York State's largest coal-fired power generation plants. In May 2000, the DEC issued Notices of Violation ("NOV") to the plants documenting non-compliance with the Act. The DEC nonetheless issued them draft operating permits. The New York Public Interest Research Group ("NYPIRG") then challenged the permits on grounds that they contained various deficiencies not permitted by the Act. After rejecting NYPIRG's request that the DEC impose additional conditions on the permits, the DEC forwarded them to the EPA for review. Ultimately, the EPA declined to object to the permits and this proceeding ensued.

We have jurisdiction pursuant to 42 U.S.C. §§ 7661d(b)(2) and 7607(b)(1). We affirm in part and vacate and remand in part.

## BACKGROUND

### I. Regulatory Framework

Title V of the Act requires that each major stationary air pollution source obtain an operating permit. 42 U.S.C. §§ 7661–7661f. So that the source, the EPA, and the public have easy access to a source's obligations under the Act, the permit must contain the applicable requirements. The EPA's Regulations explain what it intended:

> [R]egulations are often written to cover broad source categories, therefore, it may be unclear which, and how, general regulations apply to a source. As a result, EPA often has no easy way to establish whether a source is in compliance with regulations under the Act. The title V permit program will enable the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements. Increased source accountability and better enforcement should result. The program will also greatly strengthen EPA's ability to implement the Act and enhance air quality planning and control, in part, by providing the basis for better emission inventories.

57 Fed.Reg. 32250 (July 21, 1992).

The permitting process, which is somewhat complicated, works as follows: The Act provides for states to issue Title V permits in conformity with the Act's guidelines. 42 U.S.C. § 7661a. In New York, for example, the DEC has authority to issue Title V permits. A polluting source must apply to the DEC for an operating permit. After negotiations between the DEC and the source and an opportunity for public comment, the DEC must then submit the draft permit to the EPA for review. The EPA has forty-five days to object. See 42 U.S.C. § 7661d(b). Also, for sixty days after the expiration of the forty-five day EPA review period, any person may petition the EPA to object to the permit. Id. The EPA then has sixty days to grant or deny the petition, and it "shall ... object" to the permit if the petition demonstrates that the permit does not comply with the Act. Id. The denial of a petition is then subject to judicial review. Id.

Section 7661b(b)(1) requires that the permit application contain a compliance plan, including a compliance schedule, outlining how the source plans to come into compliance with the Act. The schedule of compliance must, pursuant to § 7661c(a), then be included in the permit itself. This section also requires that the permit include all enforceable emission limitations and standards, such as prevention of significant deterioration ("PSD") limits. See *LaFleur v. Whitman*, 300 F.3d 256, 262 (2d Cir.2002) ("Although these operating permit programs do not impose new substantive air quality control requirements, the permits themselves must include limitations on emissions and other conditions (such as regular monitoring, record-keeping, and reporting) necessary to ensure compliance with the provisions of the CAA, including the PSD program (if applicable). See 42 U.S.C. §§ 7661a(a), 7661c(a); 40 C.F.R. §§ 70.1(b), 70.2."). Also, § 7661b(b)(2) requires that the permittee promptly report any deviations from the permit's requirements.

The Act also contains a grandmothering clause: Polluting sources in existence in 1977 were not required initially to comply with emission limitations. But compliance by grandmothered plants is triggered by plant modifications, defined as "any physi-

cal change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4).

Finally, under § 7413(a), when the EPA finds that a source has violated the Act, the Administrator is required to notify the source and the state by issuing a NOV. Then the Administrator has several options: to issue an order requiring compliance, to levy an administrative penalty, or to bring a civil action. *Id.*

## II. Facts

The Huntley and Dunkirk power plants, which were constructed in the 1950s and now are New York State's two largest coal-fired power plants, accounted for 21% of all the Nitrogen Oxide ("NO$_x$") and 38% of all the Sulfur Dioxide ("SO$_2$") emissions from New York power plants in 2000. They were owned and operated by Niagara Mohawk Power Corporation until June 1999, when NRG Energy, Inc. ("NRG") purchased them.

In May 2000, the DEC issued a NOV to the two plants indicating that they had been modified without obtaining the PSD permits required prior to plant modification:

> Commencing at various times since 1977, Niagara Mohawk and NRG have modified and/or operated the [Huntley and Dunkirk power plants] without obtaining a Prevention of Significant Deterioration ("PSD") permit authorizing the construction and operation of physical modifications of their boiler and turbine units .... Niagara Mohawk and NRG have operated these modifications without installing the required pollution control equipment.... Until these violations are corrected, the facilities will continue to illegally release massive

amounts of SO$_2$ and NO$_x$ into the environment.

In Re Violations of Article 19 of the Environmental Conservation Law by Niagara Mohawk Power Corporation, NRG Energy, Inc., DEC Notice of Violation, (May 25, 2000). The NOV describes in considerable detail each modification and each emissions violation. For instance, the first of many listed violations asserts: "Modifications on Unit 1 [in the Dunkirk Steam Station] from 1983 to 1985, including the following projects: (1) Induced draft fan modification; (2) Replacement of wall lower slopes, burner corner, arch; (3) Replacement of condenser tubes; (4) Replacement of economizer tubes; and (5) Replacement of coal mill parts." *Id.*

In April and May 2001, the DEC nonetheless released draft operating permits for the Huntley and Dunkirk plants which did not include PSD limits or a compliance schedule. During the ensuing public comment period, NYPIRG protested these omissions. The DEC disagreed with NYPIRG, maintaining that the applicability of PSD limits to the two plants was still a subject of negotiation and, until the matter was resolved in some way, those limits and schedules were not required to be included in the permits. The DEC then submitted the draft permits to the EPA for review. When the EPA did not object, NYPIRG petitioned it to do so. The EPA denied NYPIRG's petition on the basis that, so long as the source did not concede that particular PSD limits applied, permits could issue subject to later amendment once the DEC and the source reached agreement as to PSD limits. Furthermore, the EPA maintained that the DEC had discretion under Title V not to include in the permits PSD limits not yet determined to be applicable.

In January 2002, in connection with the Notice of Violation that the DEC had is-

sued in May 2000, the DEC sued Niagara Mohawk and NRG, the former and current owners of Huntley and Dunkirk, in the District Court for the Western District of New York, claiming that their failure to obtain preconstruction permits before making modifications to the plants violated the Act. *See New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650 (W.D.N.Y.2003). The DEC now takes the position that it is entitled to resort to this type of enforcement litigation in lieu of otherwise available administrative proceedings. Before the substantive issues between the plants and the DEC were resolved, the District Court granted NRG's motion to dismiss on the basis that it was not liable for the prior owners' failure to obtain preconstruction permits.[1] The Court then permitted the DEC to amend its complaint to claim instead that NRG was in violation of the Act by operating without valid Title V permits. *State of New York v. Niagara Mohawk Power Corp.*, 2003 WL 23356447 (W.D.N.Y. Dec.31, 2003). The Court explained:

> The State alleges that the Title V operating permits require the NRG Defendants to obtain operating permits that include emissions limitations that meet all applicable requirements .... Because the NRG Defendants have allegedly not done so, the State contends that they have violated their Title V operating permits, and thus, have violated § 502(a) of the Clean Air Act, which makes it unlawful for any person to violate any requirement of a permit issued under Title V, or to operate any source, including a major source, except in compliance with a permit issued by a permitting authority under Title V.

*Id.* at *2.

NYPIRG appeals, seeking our review of the EPA's failure to object to the Huntley and Dunkirk permits. NYPIRG's main contentions are that the Act requires that PSD limits,[2] a compliance schedule, and prompt deviation reporting requirements must appear in any permit, and that the EPA and the DEC do not have discretion to enforce the Act exclusively through non-administrative channels such as lawsuits. The EPA, on the other hand, maintains

---

**1.** The District Court questioned the DEC at oral argument—and then preserved the exchange in a footnote to its decision—as to the State's motive for pursuing a claim concerning preconstruction permits, rather than a claim arising out of operating permits. The latter strategy, but not the former, would have afforded a valid claim against NRG, on the theory that NRG could be held liable for operating a plant without proper operating permits. The State conceded it had other avenues for enforcement, but chose litigation on this theory as the "most straightforward claim." *New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650, 662 n. 21 (W.D.N.Y.2003) (citation and quotation marks omitted).

**2.** The EPA has challenged whether NYPIRG sufficiently raised to the EPA, during administrative proceedings below, its objection to omitting the PSD limits from the permits. NYPIRG has couched its objection as an argument for the permits to include compliance schedules. In discussing the need for a compliance schedule in the permit, NYPIRG also asserted, "It is DEC's responsibility to determine whether a facility is in violation of an applicable requirement at the time that the facility receives a Title V permit.... [I]t appears that settlement negotiations over the plant's PSD violations are floundering. It is under these circumstances that a Title V compliance schedule is needed the most." In the Matter of the Proposed Operating Permit for Huntley Power LLC, NYPIRG Petition to EPA (January 11, 2002). From NYPIRG's repeated focus on the PSD violations, we understand NYPIRG's Petition to have presumed that the compliance schedule would necessarily include PSD limits. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1148 (D.C.Cir.2002); *Natural Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1142 n. 23 (D.C.Cir.1994).

that it has discretion to determine how best to enforce the Act and that it need not include in a permit the three items identified by NYPIRG, particularly when PSD limits are the subject of ongoing negotiations between the source and the EPA and remain unresolved.

## DISCUSSION

### I. Standard of Review

■ Because the Act does not provide a standard of review, we review the EPA's actions under the Administrative Procedure Act ("APA"), which contemplates setting aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see NYPIRG v. Whitman,* 321 F.3d 316, 324 (2d Cir. 2003).

### II. Degree of Deference

■ In reviewing the EPA's determinations, *Chevron* deference guides our steps. It first instructs us to ask whether Congress has spoken directly on the issue, that is, whether the statute in question is unambiguous. *Chevron USA, Inc. v. Natural Res. Def. Council Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We do this because "[w]e will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent." *NYPIRG v. Whitman,* 321 F.3d at 324. However, if we determine that the statute is ambiguous, in the second step of the *Chevron* analysis, we defer to an agency's interpretation unless it fails the APA's "arbitrary and capricious" test.

NYPIRG contends that because the Act is unambiguous, we need not reach the second stage of the *Chevron* analysis. NYPIRG directs us to § 7661d(b)(2), the relevant statutory language in the permit-objection process: "The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of this Act . . . ." According to NYPIRG, "shall" is mandatory and indicates that Congress requires the EPA to object, assuming that the other requirements of the statute are satisfied.

■ As every agency worth its salt does, the EPA cautions that we should be especially mindful of the high level of deference it is owed when it interprets its own regulations. *See N. Am. Fund Mgmt. Corp. v. F.D.I.C.,* 991 F.2d 873, 875 (D.C.Cir.1993). The EPA does not disagree with NYPIRG's understanding of "shall." Instead, it maintains that the agency actions in question fall within the discretionary part of § 7661d(b)(2) and reminds us that we have pinpointed an important distinction between that part—whether the petition demonstrates non-compliance—and the nondiscretionary part—if such a demonstration is made, objection must follow. *NYPIRG v. Whitman,* 321 F.3d at 333. We now turn to the EPA's preliminary question "whether the petition demonstrates non-compliance," and look at whether a reasonable agency resolution of that question deserves *Chevron* deference.

### III. Petitioner's Demonstration of Non–Compliance

■ *NYPIRG v. Whitman,* we noted, "[was] not a case in which the EPA remained unconvinced [that the petitioner demonstrated non-compliance] and thus [was] not a challenge to its exercise of judgment." *NYPIRG v. Whitman,* 321 F.3d at 333. Similarly here, the DEC, the Act's enforcement authority in New York, had previously determined that the Huntley and Dunkirk plants were in violation of

the Act, as evidenced by the NOVs and by the suit it filed.[3] The EPA contends that its judgment was still in play for two reasons: First, notwithstanding the fact that the DEC issued NOVs and filed suit, the EPA lacked certainty about the actual scope of the plants' non-compliance because NOVs as well as complaints are inherently accusatory rather than conclusive documents. Secondly, since the DEC undertook litigation with the plants and until the litigation had run its course, the EPA could not determine the contents of the permits because the deficiencies identified in the NOVs and in the complaint might be found inapplicable, changed or mooted.

We disagree. We hold that the DEC's issuance of these NOVs and commencement of the suit is a sufficient demonstration to the Administrator of non-compliance for purposes of the Title V permit review process. The EPA, having approved New York's State Implementation Plan (6 N.Y.C.R.R. §§ 200–317), has granted the DEC the authority to enforce the Act. *See* 42 U.S.C. § 7661a(b)(5)(E); 40 C.F.R. § 70.4(b)(3). Indeed, the very structure of the Act requires regular interaction and cooperation between the federal EPA and the relevant state agencies as they implement their monitoring and enforcement responsibilities. Thus, the Act envisions thorough state enforcement. While the EPA retains enforcement authority—in a sense a redundant authority where the state implementation plan has been approved—the EPA is also charged with responding to incompetent state agencies. In particular, § 7413(a)(2) of the Act delineates appropriate EPA action where the state implementing agency fails

to act: "Whenever, on the basis of information available to the Administrator, the Administrator finds that violations of an applicable implementation plan or an approved permit program under [ ] subchapter V of this chapter are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively, the Administrator shall so notify the State." 42 U.S.C. § 7413(a)(2). Thus the EPA retains an important supervisory role as the states fulfill their responsibilities.

Under New York's implementation plan, the DEC is authorized by 6 N.Y.C.R.R. § 201–6.5(a)(2) to enforce permits: "Any permit non-compliance constitutes a violation of the [A]ct and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application." Recall that the EPA is authorized to issue a NOV by § 7413(a)(1), which provides:

Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may, without regard to the period of violation (subject to section 2462 of title 28)-

(A) issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit,

---

**3.** We acknowledge that *NYPIRG v. Whitman* did not offer the nuances presented here by the state agency's role in determining which sources are non-compliant. Despite this distinction, as we discuss in more detail below,

we believe that a state implementing agency's determination that a source is non-compliant may well be a sufficient demonstration of non-compliance to the EPA Administrator.

(B) issue an administrative penalty order in accordance with subsection (d) [of this section], or

(C) bring a civil action in accordance with subsection (b) [of this section].

42 U.S.C. § 7413(a)(1). This provision means that, to issue a NOV, the Administrator must first find a source in violation of an applicable plan or permit. Similarly, 6 N.Y.C.R.R. § 201–6.5(a)(2) permits the DEC to issue a NOV, or when the Act is violated, to commence other enforcement proceedings. Both the Act and the New York implementation plan direct enforcement for a "violation" not merely for allegations.

Furthermore, the DEC, as the administering agency, has a certain expertise which distinguishes its NOVs and complaints from, for instance, allegations by a private citizen or by a non-profit organization. That is to say, ordinarily we may understand a complaint as a series of allegations whose truth is ascertained over the course of a proceeding. But in this case, the agency is required to reach certain conclusions and to make certain findings before it may take enforcement action. Also, the agency is in a privileged position to monitor and regulate. For instance, in addition to receiving regular auditing reports, DEC "representatives must be granted access to any facility regulated by this [act], during normal operating hours, for the purpose of determining compliance with this and any other state and federal air pollution control requirements, regulations or law." 6 N.Y.C.R.R. § 201–7.2(d). With this access, the DEC was able to compile specific allegations in the NOVs, which listed in considerable detail thirty-one modifications, "[each] of [which] resulted in a significant net emission increase for $NO_x$ and $SO_2$." The access guaranteed to the DEC, its authority to find and remedy violations, and the specificity of its NOVs

and complaints, all indicate that the DEC can not reasonably claim to be uncertain as to what emission limits apply to the Huntley and Dunkirk plants.

Since we are confident that the DEC does not issue NOVs lightly, we see no reason why its findings for purposes of issuing NOVs under § 201–6.5(a)(2) do not suffice to demonstrate non-compliance for purposes of objections under § 7661d(b)(1). Nevertheless, during the permit petition process, the EPA concluded that the DEC's issuance of a NOV does not demonstrate a violation for purposes of § 7661d(b)(1). We believe this conclusion is inconsistent with the text of § 7661d(b)(1) read against § 201–6.5(a)(2) and, therefore, not one to which we are required to defer.

The EPA also considers it premature to include PSD limits in a permit before they are determined by the permitting authority to be applicable. It is not premature, precisely because we believe that the DEC, in issuing the NOVs and filing suit, has determined that these standards are, indeed, applicable. Moreover, the EPA's position places it during the permitting process and subsequent appeals in the rather strange role of minimizing—if not outright denying—the legal significance of the DEC's NOVs and complaint. In reaching this conclusion, we are not called on to determine whether it is reasonable for the EPA to exclude contested PSD limits from permits when the permitting authority has not yet determined those limits applicable—this case does not present that problem.

■ Finally, the EPA takes issue with NYPIRG's reliance on the DEC's actions, specifically issuing the NOVs and filing a complaint, as opposed to NYPIRG's undertaking its own fact-finding to demonstrate non-compliance. When the EPA or a state implementing agency finds a source non-

compliant (one of the grounds for the DEC issuing a NOV under § 201–6.5(a)(2) and a prerequisite under § 7413(a)(1) for an EPA NOV), we are unclear why a private citizen should be required to duplicate that complicated and expensive effort by conducting its own fact-finding. Ultimately, we need not further consider this problem because we believe that a previous DEC determination of non-compliance, as evidenced by the NOVs and complaint, is sufficient.

## IV. Permit Compliance Schedule Requirements

■ Where a source is non-compliant, the permit must include a compliance schedule. *See* 40 C.F.R. § 70.6(c)(3). For essentially the same reasons we concluded that it was unreasonable for the EPA to discount the NOVs and complaint as evidence that the source was in violation of the Act, we also conclude that it was inconsistent with the Act for the EPA to deny NYPIRG's petition insofar as it complained of the absence of a compliance schedule. Issuance of a NOV indicates that the DEC has concluded that a source is non-compliant. Once that has occurred, the EPA is obligated to include a compliance schedule.

■ This conclusion is reinforced by the fact that, in similar past situations, the EPA has required compliance schedules. For example, the EPA objected when the State of Kentucky issued a permit to the Gallatin Steel Company without a compliance schedule:

> The EPA filed a civil judicial complaint against the Gallatin Steel Company in February 1999 for prior Clean Air Act violations and anticipates amending that complaint to include violations cited in a January 27, 2000, Notice of Violation (NOV). Therefore, the permit must include a schedule of compliance in accordance with 40 C.F.R. 70.6(c)(3). In addition, EPA and Gallatin have been engaged in settlement negotiations. If the permit is issued prior to completion of these negotiations, any compliance schedule included may have to be revised.

August 7, 2000, Notification to Kentucky Department of Environmental Protection of EPA objection to Title V Permit issued to Gallatin Steel Company pursuant to 40 C.F.R. § 70.8(c), *available at* http://www.epa.gov/region4/air/permits/gallatin-obj.htm (last visited October 14, 2005). In other words, in that proceeding the EPA took the position that any permit issued pre-settlement must include a compliance schedule that reflects up-to-date requirements although the permit could be amended post-settlement. The EPA distinguishes *Gallatin* on the basis that the parties there reached agreement before issuance of the permit. This settlement does not alter the fact that, in the Kentucky action, before the parties reached a settlement, the EPA took precisely the same position as NYPIRG now takes here. The EPA has failed to supply a reasoned basis for this 180 turn. Although past agency practice is not binding precedent, this change of course surely calls into question the EPA's current position. In *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124 (D.C.Cir.2003), the Court emphasized that "review under the APA is highly deferential, but agency action is arbitrary and capricious if it departs from agency precedent without explanation. Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970)).

To conclude, because issuance of the NOVs manifested a prior finding of non-compliance, the EPA should not have issued an operating permit without a compliance schedule.

## V. Prompt Reporting Requirements

■ Deviations from permit requirements must be "promptly" reported. 42 U.S.C. § 7661b(b)(2); *see* 40 C.F.R. § 70.6(a)(3)(iii)(B). A permitting authority has discretion to define promptness "in relation to the degree and type of deviation likely to occur and the applicable requirements." 40 C.F.R. § 70.6(a)(3)(iii)(B). Still, the House Report explains that "the permittee would presumably be required to report that violation without delay." H.R.Rep. No. 101–490, pt. 1, at 348 (1990). In commenting on the DEC's proposed operating permits program in 1996, the EPA explained: "In general, the EPA believes that 'prompt' should be defined as requiring reporting within two to ten days for deviations that may result in emission increases. *Two to ten days* is sufficient time in most cases to protect public health and safety as well as to provide a forewarning of potential problems." Clean Air Act Proposed Interim Approval of Operating Permits Program: State of New York, 61 Fed.Reg. 39617–02, 39619 (July 30, 1996) (to be codified at 40 C.F.R. pt. 70) (emphasis added).

The Dunkirk and Huntley Permits require quarterly reporting of $SO_2$ and $NO_x$ emissions and opacity data. For all other monitoring provisions, the Permits require reporting every six months. Also, § 7661c(a) generally requires reporting every six months, regardless of the requirements in a particular source's permit.

NYPIRG contends that quarterly reporting is not, by definition, prompt. NYPIRG takes issue with the EPA's statement, in its denial of NYPIRG's petition, that the plants' daily monitoring (a practice, but not a requirement) will alert the facility to any deviations and allow the plant to remedy the deviation. NYPIRG contends that the Act's prompt reporting requirements are not intended to alert the violating source, but are intended to alert the EPA and the public of deviations. Particularly where, as here, the plants have a history of violations, as evidenced by the NOVs and by the DEC's law suit. NYPIRG also argues that quarterly reporting is arbitrary and was not justified by the EPA when it denied the petition. Finally, NYPIRG contends that the six month reporting requirement for all other violations (besides $SO_2$, $NO_x$, and opacity) is an invalid interpretation of "prompt" because this would render irrelevant other provisions of the Act that also require six month reporting.

The EPA responds that the permitting authority has discretion to define promptness for each particular source. The EPA would place the burden on NYPIRG to demonstrate that the reporting requirements are invalid with respect to each type of emission, or in violation of regulatory standards. Quarterly reporting is not arbitrary, but efficient, according to the EPA, and more prompt reporting would not lead to greater compliance. Also, the EPA rejects the argument that because two separate provisions require reporting, their timing cannot coincide. The EPA asserts that because Congress did not clearly resolve this issue, the EPA's interpretation is reasonable under *Chevron*.

As an initial matter, it is clear that the DEC has authority to define "prompt" in the permits. 40 C.F.R. § 70.6(a)(3)(iii)(B). Moreover, the DEC need not establish one standard definition of "prompt" to be used consistently in all valid permits. However, this discretion does not amount to *carte blanche* to define "prompt" arbitrarily.

■ Quarterly reporting certainly contradicts both Congress' explanation of prompt as meaning "without delay," H.R.Rep. No. 101–490, pt. 1, at 348 (1990), as well as the EPA's own explanation of prompt as two to ten days. Clean Air Act Proposed Interim Approval of Operating Permits Program: State of New York, 61 Fed.Reg. 39617–02, 39619 (July 30, 1996) (to be codified at 40 C.F.R. pt. 70). However, the Act's grant of authority to the permitting agency suggests that Congress contemplated varying definitions of "prompt" depending on the particular source and particular emission. In fact, the EPA maintains here that quarterly reporting is prompt "in light of the type of deviations that could be expected at these sources." (Resp. Br. at 51). To substantiate this position, the EPA points out that quarterly monitoring of $SO_2$ is sufficient because it is "highly unlikely that fuel-oil outside the specifications would be delivered and used." (Resp. Br. at 52). The EPA also maintains that the plants recently have complied with $SO_2$ emission requirements.

With respect to the $NO_x$ emissions, the plants are subject to limits for NRG's five facilities together, not individually. With this system in place, the EPA rationally believes that more frequent individual reporting for these two plants of $NO_x$ emissions is not necessary, because calculations averaged over five plants incorporates room for minor deviations at each individual plant. Thus, with respect to $SO_2$ and $NO_x$ emissions, the EPA characterizes its decision to permit quarterly reporting as reasonable.

Although NYPIRG takes issue with this interpretation of "promptly" and with the EPA's underlying reasoning, the EPA and the DEC have statutory discretion to define "prompt" on a permit-by-permit basis. Because the EPA's definition is at least reasonable, if not the one that NYPIRG urges us to follow, we grant it *Chevron* deference. We therefore affirm the EPA's denial of NYPIRG's petition with respect to the $SO_2$ and $NO_x$ emissions.

■ With respect to quarterly reporting of opacity requirements, the EPA asserts that heightened reporting would not heighten compliance. However, the purpose of prompt reporting is not exclusively to ensure compliance, but, as we have noted, to alert the EPA and the public to emissions violations. *See* S.Rep. No. 101–228, at 347 (1989). The EPA stated in its denial of NYPIRG's petition: "[T]he facility and DEC are still in negotiations to resolve the opacity issues at the Huntley facility. Until such time as a conclusion on this matter is reached, the submission of quarterly [reports] ... is appropriate prompt reporting."

The EPA does little else to convince us of the reasonableness of its interpretation of promptly as quarterly with respect to opacity standards especially, as NYPIRG points out, in view of the plants' rich history of violating opacity requirements. We cannot conclude that is was reasonable for the EPA to define "promptly" as quarterly for a source with a history of violations simply because the DEC is still in negotiations with that source. Surely, a non-compliant source's long history of violations suggests the permitting authority should monitor it with greater—not less—scrutiny. Moreover, it is unreasonable for a permitting authority to overlook specific requirements of the Act just because its negotiations with a non-compliant source have been protracted. Because the EPA failed to demonstrate reasonableness, we need not defer. Thus, concerning opacity requirements, we remand to the EPA to determine reporting requirements consistent with the Act's promptness mandate.

■ With respect to all other monitoring provisions in the permit, for which the permit required only six month reporting, we vacate and remand. NYPIRG compares the prompt reporting requirements of § 7661b(b)(2) ("The regulations shall further require the permittee ... to promptly report any deviations from permit requirements to the permitting authority.") to § 7661c(a) ("Each permit issued ... shall include ... a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and such other conditions as are necessary to assure compliance."), and points out that basic rules of statutory construction require us to give effect to each provision. *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 145 (2d Cir.2002).

The EPA argues that even when reports are required in two separate provisions, their timing may permissibly coincide. We disagree. Here, it is not that their timing simply coincides. One provision requires biannual reporting, and the other requires prompt reporting of deviations from permit requirements. To give both provisions meaning, prompt must be interpreted at the very least as with greater speed than every six months. Also, § 7661c(a) prescribes reporting for general monitoring and § 7661b(b)(2) prescribes reporting for deviations; as deviations pose greater urgency than general monitoring, we read prompt to mean at least more frequent than biannual.

In sum, we accord *Chevron* deference to the DEC and the EPA's definition of prompt as quarterly for purposes of $SO_2$ and $NO_x$ emissions and affirm the denial of the this section of the petition. But we do not defer to the agency's interpretation that prompt means quarterly for opacity violations and every six months for all other emission deviations. Consequently, we remand this issue to the EPA.

## VI. Mootness

■ Finally we note that the errors committed by the EPA are not mooted by a recent consent decree between the plants and the DEC. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)(*quoting City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). A claim does not become moot where it is not "absolutely clear" that the offense "could not reasonably be expected to recur." *Id.* at 190, 120 S.Ct. 693 (*citing United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). We are unpersuaded that the EPA and the DEC, on the basis of the voluntary agreement reached here, would not in the future sidestep the mandated Title V permit objection procedures.

It is laudable that the parties have reached a settlement that significantly reduces emissions. But because that agreement does not erase the very real dispute here between NYPIRG and the EPA over the Congressionally authorized method for enforcement of the Act, our conclusions are unaffected by that settlement. The EPA may choose to enforce the Act by any additional channels it deems strategic, but an enforcement proceeding does not relieve the EPA of its obligations under the permitting process. Moreover, until the proposed permits conceived under the consent agreement are in place—a process of unpredictable duration—the EPA is obligated to respond to NYPIRG's petition in accordance with this opinion.

## CONCLUSION

We AFFIRM the EPA's decision not to object to the draft permits with respect to the prompt reporting of $SO_2$ and $NO_x$ emissions. We VACATE the EPA's decision not to object to the draft permits with respect to the PSD limits, the compliance schedule, and the prompt reporting of opacity violations and all other emission deviations, and REMAND to the EPA for further proceedings consistent with this opinion.