*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SIERRA CLUB,

                      *Petitioner,*

    *v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LISA JACKSON,
Administrator,

                      *Respondents,*

EAST KENTUCKY POWER COOPERATIVE, INC.,
           *Intervenor-Respondent.*

No. 07-4485

_____

On Petition for Review of an Order of the
Administrator of the Environmental Protection Agency.
No. FRL-8481.

Argued: December 10, 2008

Decided and Filed: February 26, 2009

Before: BATCHELDER, GILMAN and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David C. Bender, GARVEY, McNEIL & McGILLIVRAY, Madison, Wisconsin, for Petitioner. Joshua M. Levin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Harry M. Johnson III, HUNTON & WILLIAMS, Richmond, Virginia, for Intervenor. **ON BRIEF:** David C. Bender, Christa O. Westerberg, GARVEY, McNEIL & McGILLIVRAY, Madison, Wisconsin, Stephanie Tai, UNIVERSITY OF WISCONSIN LAW SCHOOL, Madison, Wisconsin, for Petitioner. Joshua M. Levin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Harry M. Johnson III, John M. Holloway III, Penny A. Shamblin, Sean P. Trende, HUNTON & WILLIAMS, Richmond, Virginia, for Intervenor.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  The Clean Air Act requires the Environmental Protection Agency to object to an air-pollution permit if any person "demonstrates" to the EPA "that the permit is not in compliance" with the Act's requirements.  42 U.S.C. § 7661d(b)(2).  In August 2006, the Sierra Club petitioned the EPA Administrator to object to a permit issued by the Kentucky Division of Air Quality to the East Kentucky Power Cooperative, claiming it had "demonstrate[d]" non-compliance because the EPA previously had issued a notice of violation to the same company (about the same plant) in January 2003 and had filed a federal-court complaint against the same company (about the same plant) in January 2004.  The EPA declined to object.  Because it reasonably interpreted § 7661d(b)(2) to mean that the agency may alter its position about a power plant's compliance with the Act based on intervening events and because the Sierra Club does not challenge the impact of these intervening events on the power plant's compliance with the Act, we deny the petition for review.

I.

A.

Under Title V of the Clear Air Act, every "major source" of air pollution must obtain an operating permit from a state agency that identifies each air-quality restriction that applies to the source.  *See id*. §§ 7661a(a), 7661c(a); 40 C.F.R. §§ 70.5, 70.6.  The permit must contain a "compliance schedule," listing the Act's requirements with which the source (1) already complies, (2) will comply once the permit goes into effect and (3) does not comply along with a "schedule of remedial measures" designed to bring the source into compliance.  40 C.F.R. § 70.5(c)(8)(iii)(A)–(C); *see also* 401 Ky. Admin. Regs. 52:020-5(8)(b).  Several reporting, monitoring and other duties apply to each requirement.  *See* 42 U.S.C. § 7661c(c).

As a form of cooperative federalism, the Act gives both the States and the EPA a role in administering the Title V program.  After a State gives the public an opportunity to

comment on a proposed permit, *id*. § 7661a(b)(6), but before it goes into effect, the State must submit the permit to the EPA, which has 45 days to review it, *id.* § 7661d(b)(1). If the EPA concludes that the permit does not comply with federal requirements, it "shall . . . object to [the permit's] issuance." *Id.* But if the EPA takes no action within the exclusive-review period, "any person" may petition the agency to object. *Id.* § 7661d(b)(2). And "if the petitioner *demonstrates* to the Administrator that the permit is not in compliance with the requirements of" the Act, "[t]he Administrator shall issue an objection," requiring the State to modify the permit. *Id.* (emphasis added).

One obligation that often comes up during the permitting process is the Prevention of Significant Deterioration (PSD) requirement, which applies to all "attainment areas" in the country—those that already have met the Act's baseline national air-quality standards. *See id*. §§ 7470–7492. In an effort to prevent backsliding, the Act requires sources from these parts of the country to satisfy additional anti-pollution standards. Every new "major emitting facility" constructed in an attainment area, as well as every existing facility that undergoes a "major modification," must obtain a special permit identifying specific emissions limitations, *id.* §§ 7475(a)(1), 7479(1), (2)(C), and must employ the "best available control technology" for each regulated pollutant it emits, *id.* § 7475(a)(4); *see Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 471–73 (2004). Instead of establishing universal best-technology standards, the Act directs the States to determine the best technology for each source "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." 42 U.S.C. § 7479(3).

The Act creates several enforcement options. In addition to setting out subject-specific enforcement procedures, *see, e.g.*, *id.* § 7477, and authorizing citizen suits, *see id.* § 7604, the statute allows the EPA to address violations on its own, *see id.* § 7413. "Whenever, on the basis of any information available to [it], [the agency] finds that any person has violated or is in violation of any requirement or prohibition of an applicable [state] implementation plan or permit," the Act directs the EPA to issue a notice of violation apprising the source and the State of its findings. *Id.* § 7413(a)(1); *see also id.* § 7413(a)(3). After 30 days, the agency "may" pursue one of three options: (1) issue an order directing the source to comply with its existing obligations, (2) impose an "administrative penalty" on

the source (after a formal administrative hearing) or (3) file a federal lawsuit against the source. *See id.* § 7413(a)(1), (a)(4), (d).

B.

This case arises from the power company's request for a renewal of its Title V permit for one of the coal-powered steam generators, known (not so descriptively) as Unit 2, at the Spurlock Station power plant in Maysville, Kentucky. The company first obtained a permit for Unit 2 when it built the plant in the late 1970s. The company later made several changes to the plant. In August 1992, it began supplying steam from Unit 2 to a nearby factory, even though its original construction-permit application said that Unit 2 would use steam only to generate electricity. And in January 1994 or so, the company increased the plant's heat-input rate, allegedly operating above the level specified in its original permits. When the company applied for a Title V permit for Unit 2 in 1996, it did not identify the PSD requirements stemming from these changes and did not propose a PSD compliance schedule. The Kentucky agency granted the permit in 1999.

In 2003, apparently after discovering these changes to the plant, the EPA issued a notice of violation, informing the company that its Unit 2 permit failed to address the PSD requirements stemming from these modifications. A year later, the EPA filed an enforcement lawsuit in federal court premised on the same allegations. In response, the company denied that the changes amounted to modifications triggering new PSD (and best-technology) obligations.

In 2004, while this litigation was pending, the company sought to renew its Title V permit, once again without mentioning the PSD requirements stemming from its 1990s modifications. In January 2006, after reviewing the submission and requesting additional information, the state agency invited public comment on whether to grant the permit. After receiving comments from the Sierra Club, the EPA and others, the state agency proposed the draft permit to the EPA for its review. The EPA did not object to it within the 45-day exclusive-review window, and the state agency issued the permit on July 31, 2006.

In August 2006, the Sierra Club petitioned the EPA to object to the permit, *see id.* § 7661d(b)(2), arguing (as it did in its comments to the state agency) that the proposed

permit was deficient because it failed to address the PSD requirements. In support, the Sierra Club relied solely on the fact that the EPA previously had issued a notice of violation and had filed a civil-enforcement action based on the same allegations.

The EPA and the power company, meanwhile, reached a settlement in the enforcement lawsuit in July 2007 and proposed a consent decree to the district court. Under the proposed decree, the company preserved the position that it had not violated the Act, but it agreed to pay a civil penalty and perform several remedial measures, including installing pollution controls that carried a price tag of over $650 million (according to the government).

In August 2007, while the parties waited for the district court to approve the consent decree, the EPA reached a decision on the Sierra Club's petition. Although it granted the petition in part (on an unrelated issue), it declined to object to the power company's failure to address the PSD requirements. Acknowledging its prior notice of violation and enforcement action, the EPA explained that they were "initial steps" in the enforcement process and did not reflect the agency's final position as to whether the Title V permit for Unit 2 needed to include a PSD compliance schedule. JA 16. In September 2007, the district court approved the consent decree. *See United States v. E. Ky. Power Coop., Inc.*, No. 04-34-KSF (E.D. Ky. Sept. 24, 2007). And in December 2007, the Sierra Club petitioned this court for review of the EPA's refusal to object to the power company's failure to address the PSD requirements.

## II.

The question is this: Does the Act require the EPA to object to a permit request when the agency previously has filed a notice of violation and enforcement action regarding the same allegations about the same plant? The answer turns on the meaning of a statute that the EPA administers and thus turns on an application of the familiar *Chevron* framework. Unless the statute's terms "directly address[] the precise question at issue," *Chevron* says that we must defer to the EPA's "reasonable" interpretation of the provision. *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). And if the EPA's construction of the statute is a reasonable one, we must accept its application of that interpretation to the Sierra Club's petition unless it is arbitrary or capricious. *See* 5 U.S.C.

§ 706(2)(A); *Ohio Pub. Interest Research Group, Inc. v. Whitman*, 386 F.3d 792, 795 (6th Cir. 2004).

The terms of § 7661d(b)(2) do not directly answer the statutory question. "The Administrator," it says, "*shall* issue an objection within such period *if* the petitioner *demonstrates* to the Administrator that the permit is not in compliance with the requirements of this chapter." 42 U.S.C. § 7661d(b)(2) (emphases added). In one sense, yes, this language is clear and supports the Sierra Club's position: The provision imposes a mandatory duty to object to a draft Title V permit if the petitioner demonstrates that the permit falls short of federal requirements. Once the petitioner makes that showing—whatever that showing entails—the EPA has no leeway to withhold an objection. *See Sierra Club v. Johnson* (*Sierra Club II*), 541 F.3d 1257, 1265–66 (11th Cir. 2008); *see also Sierra Club v. Johnson* (*Sierra Club I*), 436 F.3d 1269, 1280 (11th Cir. 2006); *N.Y. Pub. Interest Research Group v. Whitman* (*NYPIRG I*), 321 F.3d 316, 333–34 (2d Cir. 2003).

But that is just half of the clarity that the Sierra Club needs to establish. Even though § 7661d(b)(2) compels the EPA to object whenever a petitioner demonstrates noncompliance, it does not say what "demonstrates" means. How much and what kinds of proof must the petitioner provide? Neither the statute nor the regulations define the term, and dictionary definitions of "demonstrate" suggest a range of possibilities. Perhaps merely "point[ing] out" a potential defect in a permit will do, *Webster's Third New International Dictionary* 600 (2002), suggesting a burden satisfied by allegations alone—not unlike civil-pleading requirements. Perhaps a petitioner must "manifest clearly, certainly, or unmistakably" that the permit falls short in a material way, *id.*, a threshold that comes closer to a clear-and-convincing-evidence standard. Or perhaps the requisite showing falls somewhere in between, such as "illustrat[ing] or explain[ing] in an orderly and detailed way . . . with many examples, specimens, and particulars," *id.* That the petitioners must demonstrate these things *to the EPA* suggests a role for the agency's expertise and judgment to play. *See Sierra Club II*, 541 F.3d at 1266–67; *NYPIRG I*, 321 F.3d at 333 & n.11. But how widely that discretion ranges and what role, if any, the EPA's prior allegations play in the equation are left unspecified. The terms of the provision do not directly answer this question. *See Sierra Club II*, 541 F.3d at 1266; *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 677–78 (7th Cir. 2008).

Context does not clear things up. The rest of § 7661d(b)(2) tells us a bunch of things: that the timeline for the EPA to issue an objection is short, that a petitioner generally may seek an objection only on a ground it raised during the permit's public-comment period, that filing a petition does not affect a permit already issued until the EPA decides to object, that the Administrator cannot delegate the decision whether a petitioner has made a demonstration and that the EPA's decision is subject to judicial review. *See* 42 U.S.C. § 7661d(b)(2). But none of these things clarifies the answer to this question. The neighboring provisions give us little more to go on. Section 7661d(b)(1) says that, before private persons and groups may force the agency's hand, the EPA gets the first crack at the petition and must object if it "determine[s]" that the petition does not comply with the Act. *Id.* § 7661d(b)(1). And § 7661d(b)(3) explains the effect of the EPA's objection: If the state permitting agency has not yet issued the permit, it may not do so until it addresses the EPA's concern; if the state agency has issued the permit, the EPA must step in and "modify, terminate, or revoke" it to bring it into compliance with federal law. *Id.* § 7661d(b)(3). These provisions do not say (or even suggest) whether § 7661d(b)(2) is satisfied solely by relying on a prior notice of violation and civil complaint issued by the EPA.

That leaves us with an ambiguous provision, one that *Chevron* empowers the agency to interpret definitively so long as it does so reasonably. In exercising that authority, the EPA Administrator construes § 7661d(b)(2) to mean this: Although the agency's prior notice of violation and enforcement action are "relevant factor[s]," JA 16, in assessing a petitioner's subsequent efforts to "demonstrate" permit non-compliance, they do not necessarily make the showing by themselves to the exclusion of other considerations, such as (1) the kind and quality of information underlying the agency's original finding that a prior violation occurred, (2) the information the petitioner puts forward in addition to the agency's enforcement actions, (3) the types of factual and legal issues that remain in dispute, (4) the amount of time that has lapsed between the original decision and the current one and (5) the likelihood that a pending enforcement case could resolve some of those issues. That, we think, is a reasonable interpretation of the statute. Just as these types of intervening developments may prompt the agency to revisit a prior decision to issue a notice of violation, so they may prompt the agency to revisit a prior decision *not* to issue a notice of violation.

The Eleventh Circuit reached the same conclusion in *Sierra Club II*. The Sierra Club asked the EPA to object to a Title V permit, relying solely on allegations that the EPA had made in a notice of violation and civil complaint that the same source was subject to PSD obligations. *See* 541 F.3d at 1262–63. The EPA declined to grant the objection for the same reason it gave here, and the Eleventh Circuit upheld the decision, accepting the agency's interpretation of § 7661d(b)(2) as a reasonable construction of the statute. *See id.* at 1266–69. The notice of violation and the complaint, the court reasoned, were merely initial steps in the enforcement process that did not prove the facts alleged, *id.* at 1267–68, and the ensuing enforcement suit had done nothing to bolster the agency's allegations: The source had contested them, and the district court had administratively closed the case without reaching a decision on the merits, *id.* at 1262, 1268. The EPA thus reasonably interpreted the statute, the court concluded, to require the petitioners to point to something more than the agency's own prior allegations.

In resisting this conclusion, the Sierra Club raises several arguments. *First*, it invokes § 7413(a)(1), which explains when the EPA may file a notice of violation or a related enforcement action:

> Whenever, on the basis of any information available to the Administrator, the Administrator *finds* that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such *finding*. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may . . . bring a civil action . . . .

42 U.S.C. § 7413(a)(1) (emphases added). No matter how one construes the demonstrates-a-violation requirement, the Sierra Club argues, a prior "finding" of a violation by the same federal agency about the same plant concerning the same requirements of the Act necessarily satisfies it. A prior "finding" of a violation by the EPA, true enough, will bear on, and customarily provide support for, a subsequent effort to "demonstrate" the same kind of violation by the same plant. But what is often true is not necessarily always true. That the EPA must premise an enforcement action on a "finding" of a violation at a given point in time does not bind the agency for all time. "[F]inds" in this setting refers to an initial determination—sometimes tentative, sometimes certain, but always subject to revision based on new information. The term simply does not suggest a definitive, once-and-for-all

determination by the agency that estops it from arriving at a different conclusion in a different factual or legal setting.  The EPA is no more bound by a prior violation finding than by a prior no-violation finding.

The statute says what it takes to make this initial "finding," moreover, and it is not much.  The statute authorizes the agency to make a finding based on "any information available," *id.*, which suggests a low evidentiary standard, *see Sierra Club II*, 541 F.3d at 1267, one perhaps satisfied by no more than "a staff report, newspaper clipping, anonymous phone tip, or anything else that would constitute 'any information,'" *TVA v. Whitman*, 336 F.3d 1236, 1241 & n.6 (11th Cir. 2003).  When additional information materializes, as for example through discovery during an enforcement action, the EPA's initial factual and legal premises of the finding may be thwarted, which surely permits a modification of its enforcement stance when a later § 7661d(b)(2) petition is filed.  Congress no doubt could have required the agency to go through a formal factual adjudication before making an initial finding, and it has done so in a similar context.  *See* 42 U.S.C. § 7413(d)(2)(A) (requiring a formal APA-style hearing when the EPA tries to impose civil penalties without filing an enforcement suit).  But it did not do so here.  The absence of such a requirement, it bears adding, generally will further vigorous enforcement of the Act:  The more that is required of the EPA *before* it can make such a "finding," the less often the agency will be able to pull the initial enforcement trigger.

The setting of this "finding" requirement also confirms that it reflects the agency's first, not its last, word on the subject.  Such a "finding" allows the agency to issue a notice of violation, which serves to give the source advance notice that the agency may pursue enforcement measures.  *See id*. § 7413(a)(1); *see also Sierra Club II*, 541 F.3d at 1267–68.  Once the EPA issues this notice, it may:  (1) direct the source to comply with its obligations after giving the source "an opportunity to confer" with the agency; (2) conduct a formal administrative adjudication (after discovery) to decide whether to impose a civil penalty; or (3) file a federal-court lawsuit, asking the court to decide whether the source violated some applicable requirement.  *See* 42 U.S.C. § 7413(a)(1), (a)(4), (b), (d).

Whichever path the agency chooses, its initial "finding" marks only the beginning of a process designed to test the accuracy of the agency's initial conclusions.  And that

process may prove the opposite: The statute contemplates that litigation may disprove the agency's allegations, may disprove the reasonableness of the agency's allegations, *see id.* § 7413(b)(3) (allowing attorney's and expert's fees if the EPA files an unreasonable enforcement suit), or may result in a stalemate or settlement, *see id.* § 7413(g). These provisions suggest that the agency will not invariably stand by its initial allegations. Whatever it takes for the EPA to "find[]" a violation at the outset, it could reasonably construe "demonstrates" in § 7661d(b)(2) to require something more in some settings.

The Sierra Club's reading also ties the agency's hands in an odd way. After initiating an enforcement suit, the EPA may learn that its initial allegations do not hold water. Perhaps evidence gathered in discovery will prove that certain acts never took place, or perhaps a court will conclude that the source was not subject to certain legal requirements. Yet, if the Sierra Club is right, even when this happens, the agency would have to cling to an initial conclusion reached months or years earlier—three and a half years earlier in this instance—based on "any information available" to it at the time, *id.* § 7413(a)(1). Besides giving short shrift to the truth-seeking function of litigation, this interpretation could discourage the EPA from engaging in discretionary enforcement actions in the first place. If the agency knows that every notice of violation will tie its hands indefinitely, it may think twice before taking a first step into the enforcement waters. The agency's reading, by contrast, avoids this problem by leaving the EPA free to take account of new developments and discoveries. That flexibility, moreover, comes at little cost: If the agency declines to object but later concludes that a violation does exist and the permit is indeed defective, the EPA can revise (or revoke) the permit as needed. *See id.* § 7661d(e) (allowing the EPA to "terminate, modify, or revoke and reissue" a permit for cause); 40 C.F.R. § 70.7(f)(iii) (allowing the EPA to "reopen" a permit for cause); *cf. In re Lovett Generating Station*, Pet. No. II-2001-07, Order at 19–20 (EPA Feb. 19, 2003).

*Second*, and perhaps most significantly, the Sierra Club points out that a sister court of appeals reached a different conclusion in a (roughly) comparable setting. In *New York Public Interest Research Group, Inc. v. Johnson* (*NYPIRG II*), 427 F.3d 172 (2d Cir. 2005), the Second Circuit held that a claimant "demonstrate[d]" to the EPA that a state-issued permit failed to comply with the Act by pointing only to a prior notice of violation and enforcement lawsuit filed by the state permit-issuing agency. *See id.* at 179–83. Because

state law allowed the permitting agency to take such measures only if the source violated the Act, *see* 6 N.Y. Comp. Codes R. & Regs. § 201-6.5(a)(2), because the state agency's expertise and "privileged position" provided greater access to key information and because the court was "confident that the [agency] does not issue [notices of violation] lightly," the court concluded that the State's prior actions by themselves sufficed to demonstrate noncompliance. *See NYPIRG II*, 427 F.3d at 181–82. Requiring the petitioner to "duplicate [the agency's] complicated and expensive effort by conducting its own fact-finding," the court concluded, would be pointless. *Id.* at 182.

We have no doubt that state agencies, like the EPA, do not issue violation notices or file enforcement lawsuits "lightly." *Id.* at 181. Nor do we doubt that state and federal environmental agencies have a greater ability than the average private citizen, or even an experienced interest group like the Sierra Club, to detect and assess clean-air violations. *Id.* But that does not explain why we should give less weight to the agency's *later* conclusion that the polluting source did not violate federal law. If the agency was in a "privileged position" when it found a violation in the first place, *id.*, why did it not "maintain[]" that "privileged position" in "assessing the current strength of its case and evaluating whether the PSD issue has been definitively resolved," *Sierra Club II*, 541 F.3d at 1268? That is even more true when the prior findings were made by a *different* agency (and a different sovereign), which was the case in *NYPIRG II*. Even though the EPA has delegated certain enforcement responsibilities to each state agency, *see NYPIRG II*, 427 F.3d at 180, that does not mean that the EPA must blindly defer to a state agency's conclusions.

In one sense, the Second Circuit's decision seems to conflict squarely with ours. If that court takes the view that a prior *state agency* notice of violation and enforcement lawsuit by themselves suffice to demonstrate to the EPA that a permit is noncompliant, then surely prior enforcement actions by the *same federal agency* ought to bind it down the road. But there are two features of *NYPIRG II* that may explain why the Second Circuit took the path it did. One turns on the underlying state regulations. A provision of the state regulations appeared to parallel § 7413(a)(1), because both provisions allowed the agency to take enforcement measures only if a violation took place. *See id*. at 180–81. Absent from the state regulation, however, is the language in the federal statute authorizing enforcement actions if the agency merely "finds" a violation "on the basis of any information available."

42 U.S.C. § 7413(a)(1); *see* 6 N.Y. Comp. Codes R. & Regs. § 201-6.5(a)(2) (providing that "[a]ny permit non-compliance constitutes a violation of the Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application"). The state regulation at issue thus may have required a more robust determination than the EPA must make before it issues a notice of violation or files a complaint, prompting the court to lean more heavily on the existence of that prior agency action.

The other possibility turns on timing. In the Second Circuit case, the petition was filed in the same month (and close to the same day) as the state agency filed the enforcement action. *See NYPIRG II*, 427 F.3d at 177, 178 n.2; *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 660 n.17 (W.D.N.Y. 2003). By contrast, in the Eleventh Circuit case, the petition was filed six years after the EPA had initiated its enforcement action and notice of violation, *see Sierra Club II*, 541 F.3d at 1262; *In re Ga. Power Co.*, Permit No. 4911-015-0011-V-02-0, Order at 1 (EPA Jan. 8, 2007), and in our case the petition was filed two and a half years after the EPA initiated its enforcement action (and three and a half years after its notice of violation). It may be unfair, in other words, to read the Second Circuit's decision as establishing a bright-line rule that, once a regulatory agency initiates an enforcement action, it must stand by that position in addressing all future petitions regarding the same plant and the same regulatory requirements. Better, it seems to us, to treat the decision as one that turns at least in part on the overlap in timing between the enforcement action and the petition seeking an objection—which in most cases will suggest that the EPA had acted arbitrarily or capriciously.

*Third*, the Sierra Club contends that the EPA's construction of § 7661d(b)(2) deserves no deference because it reflects an unexplained reversal of policy. The agency, we are told, "gave a definitive meaning" to § 7661d(b)(2)'s "demonstrates" requirement in a previous permit proceeding, *see* Gallatin Steel Co., Permit No. V-99-003, EPA Title V Permit Objection Letter (Aug. 7, 2000) (*Gallatin Steel*), when an EPA regional office issued an objection based on a prior notice of violation and complaint issued by the EPA. In the Sierra Club's view, the EPA's position thus "represents a 180 turn" not entitled to judicial deference. Reply Br. at 15; *see also* Pet'r Br. at 35–36.

Although an unexplained about-face in agency policy may amount to "an arbitrary and capricious change from agency practice," *Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005), no such reversal occurred here. There is some reason, as an initial matter, to doubt whether *Gallatin Steel* "gave a definitive meaning" to this statutory term. The objection letter in that case says nothing about the "demonstrates" requirement of § 7662d(b)(2), an understandable omission since by all appearances that provision was not at issue and the agency instead appeared to be acting in connection with § 7661d(b)(1). *See Gallatin Steel*, Objection Letter at 1 & Ex. 1 at 3.

Be that as it may, the EPA later recognized the practical problems of the approach its regional office took in *Gallatin Steel*. In *Lovett*, the EPA took the view that it would not grant a petitioner's request to object to a permit—in which the ground for objection was solely that the agency previously had issued a notice of violation—where settlement negotiations in the enforcement action had not yet produced a final, court-approved settlement. *See Lovett*, Order at 19–20. There, the EPA explained, the solution is to let the permit go forward and, if and when a final consent decree is issued, to modify the permit to include a compliance schedule. *See id.* Here, in addition to citing *Lovett*, the EPA provided a fuller defense of its approach, parsing the statutory provisions and highlighting the costs of the Sierra Club's construction. The EPA's explanation of its policy, particularly as compared to its conclusory comment in *Gallatin Steel*, does not amount to a capricious change of course.

*Fourth*, even if § 7661d(b)(2) allows the EPA to depart from earlier findings, as when litigation calls them into question, the Sierra Club argues that nothing of the sort happened here. The district court, it points out, never rejected the federal agency's claim concerning Unit 2 on the merits, and the agency never recanted its earlier contentions or amended (or withdrew) its complaint. But, as we read the record, the EPA did alter its position in the enforcement action—and did so after several years of litigation, after evidence gathering by both sides and after a series of inconclusive rulings by the district court. Keep in mind that the EPA acted on the Sierra Club's permit-objection petition at roughly the same time that it settled its enforcement action regarding the same plant and the same permit. In July 2007, the parties to the enforcement action agreed to settle the lawsuit and to submit a

consent decree to the district court for approval. In August 2007, the EPA denied the Sierra Club's petition. And in September 2007, the district court approved the consent decree.

By its terms, the consent decree resolved *all* claims that the EPA had raised in its enforcement action, which necessarily includes the claim related to the Sierra Club's permit objection. "Entry of this Decree," it says, "shall resolve all civil claims of the United States under [specified provisions of the Clean Air Act] that arose from any modifications that commenced at any System Unit [of the power company] prior to the date of lodging of this Decree, including but not limited to those modifications alleged in the Complaint in this civil action." JA 477–78. A quid pro quo of the settlement thus was that the EPA would drop the very charge that is the basis for the Sierra Club's permit objection—meaning that whatever charge had been "demonstrate[d]" when the EPA filed the notice of violation four years earlier was no longer necessarily true once the EPA had dismissed this aspect of its enforcement action. Otherwise, any third party would have veto power of any proposed settlement between the agency and a charged party. Once the agency filed a charge, it either would have to litigate the charge to completion or could settle the claim only with the blessing of any potential third party, whether that party was a participant in the litigation or not. There is nothing in the statute that requires the agency to take such an unyielding and unusual approach to its enforcement duties.

Under these circumstances, the EPA acted within its authority in addressing the Sierra Club's objection. Consistent with *Chevron*, the EPA reasonably construed § 7661d(b)(2) to mean that a prior notice of violation and enforcement action did not by themselves require it to object to a permit request. And consistent with the APA, the EPA did not arbitrarily or capriciously deny the Sierra Club's request, after accounting not only for the agency's prior actions but also for developments in that litigation.

III.

For these reasons, we deny the petition for review.