[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-11537
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 2, 2008
THOMAS K. KAHN
CLERK

Agency Nos. IV-2005-3
IV-2005-4, & IV-2006-1

SIERRA CLUB,
COOSA RIVER BASIN INITIATIVE,

Petitioners,

versus

STEPHEN L. JOHNSON,
in his capacity as Administrator,
United States Environmental Protection Agency,

Respondent,

GEORGIA POWER COMPANY,
OGLETHORPE POWER CORPORATION,
GEORGIA ENVIRONMENTAL PROTECTION DIVISION,

Intervenors.

_____

Petition for Review of a Decision of the
Environmental Protection Agency

_____

**(September 2, 2008)**

Before EDMONDSON, Chief Judge, BLACK and FARRIS,[*] Circuit Judges.

BLACK, Circuit Judge:

This Clean Air Act case involves a dispute over what triggers the Environmental Protection Agency's statutory duty to object to the issuance of a Title V operating permit under 42 U.S.C. § 7661d(b)(2). The Clean Air Act requires the EPA Administrator to object to an operating permit "if [a] petitioner demonstrates to the Administrator that [a] permit is not in compliance with the requirements of [the Clean Air Act]." *Id.* The Sierra Club and the Coosa River Basin Initiative, the Petitioners in this case, challenge operating permits issued to the Georgia Power Company. In mounting their challenge before the EPA Administrator, Petitioners relied exclusively on the agency's own violation notice and a subsequent complaint filed against Georgia Power in an unresolved civil enforcement action. The EPA Administrator refused to object. He found the Petitioners had not satisfied their burden of demonstrating the Georgia Power permits were not in compliance with the Act. Petitioners now ask this Court to force the agency to issue objections to the permits. We deny the request because we hold the EPA Administrator's actions fell within the bounds of his discretion: A violation notice and civil complaint are merely initial steps in an enforcement

---

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

action and do not, by themselves, inevitably trigger the EPA Administrator's duty to object under 42 U.S.C. § 7661d(b)(2).

## I. BACKGROUND

Georgia Power Company operates several large coal-fired power plants throughout the State of Georgia. This case involves two of those plants: the Bowen Steam-Electric Generating Plant and the Scherer Steam-Electric Generating Plant. The Bowen and Scherer plants emit large amounts of air pollution each year and, like all major sources of air pollution, are required to maintain operating permits under Title V of the Clean Air Act. *See* 42 U.S.C. §§ 7661-7661f. An operating permit is a regulatory tool. It lists, in a single document, all of the clean air requirements that apply to a particular source of pollution.

Petitioners believe the operating permits issued to the Bowen and Scherer plants are deficient and do not list all of the clean air requirements that should apply to those plants. On its face, Petitioner's position would appear to be supported by a violation notice issued by the EPA and a resulting civil action filed against Georgia Power to force compliance with certain provisions of the Clean Air Act. Not so, says EPA. The underlying fight with Georgia Power is still unresolved and an agency's discretion is vast. Thus, in this case the EPA finds itself in the peculiar position of defending its decision not to object to the operating permits without backing away from its violation notice or enforcement action. To

3

explain why we conclude the EPA's position is ultimately tenable, we begin with a brief overview of the provisions of the Clean Air Act and the facts that underlie the dispute.

*A.    Title V Permit Program*

The Clean Air Act is a comprehensive regulatory scheme developed by Congress to prevent and control air pollution. *See* 42 U.S.C. § 7401. Under the Act, the EPA establishes national air quality standards for various pollutants and works with the states to achieve those standards. *See, e.g.*, *id.* §§ 7409-7410. In 1990, Congress added Title V to the Act and created a national permitting program. *See* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, §§ 501-507, 104 Stat. 2399, 2635-48 (codified at 42 U.S.C. §§ 7661-7661f (2000)).

Title V requires all major sources of air pollution to obtain operating permits that contain emission limitations and other conditions to ensure compliance with air quality control standards. *Sierra Club v. Johnson*, 436 F.3d 1269, 1272 (11th Cir. 2006). Each permit is source specific: "The intent of Title V is to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution." *Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1348-49 (11th Cir. 2006) (citing Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21, 1992) (codified at 40 C.F.R. § 70)). In this

4

way, clarity and transparency were added to the regulatory process to help citizens, regulators, and polluters themselves understand which clean air requirements apply to a particular source of air pollution. The goal is "[i]ncreased source accountability and better enforcement." Operating Permit Program, 57 Fed. Reg. at 32,251. Title V does not generally impose new substantive air quality control requirements. *Id.*; *Sierra Club v. Ga. Power Co.*, 443 F.3d at 1348; *Sierra Club v. Johnson*, 436 F.3d at 1272. "Instead, in order to ensure compliance with existing requirements, Title V requires permits to contain monitoring, record keeping, reporting, and other conditions." *Sierra Club v. Johnson*, 436 F.3d at 1272.

In order to carry out Title V, Congress called on the states to design and enforce their own permitting programs and to submit those programs to the EPA for final approval. 42 U.S.C. § 7661a. The State of Georgia's permitting program has been approved by the EPA and is administered by the Environmental Protection Division (EPD) of Georgia's Department of Natural Resources. *See Sierra Club v. Ga. Power Co.*, 443 F.3d at 1349. When a state permitting authority, like EPD, issues Title V permits, the terms of those permits must contain all air quality requirements that apply to the source of pollution, as well as conditions sufficient to assure the source's compliance with those requirements. *See* 42 U.S.C. § 7661c(a). To that end, each permit must include a "schedule of compliance," *id.*, and if a source is out of compliance when the permit is issued,

5

the permit must also include "a schedule of remedial measures, including an enforceable sequence of actions . . . leading to compliance," 40 C.F.R. § 70.5(c)(8)(iii). *See also* 42 U.S.C. § 7661(3); 40 C.F.R. § 70.6(c), (c)(3).

Among the many air quality requirements included in an operating permit, if applicable, are prevention of significant deterioration (PSD) limits. PSD limits were enacted as part of the 1977 amendments to the Clean Air Act for the purpose of ensuring air quality in clean areas does not degrade. *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 470-71, 124 S. Ct. 983, 992 (2004). PSD limits do not, however, apply to all sources of air pollution. Pollution sources in existence as of August 7, 1977 were grandfathered out of complying with PSD requirements unless and until those sources are modified in a way that increases pollution. *See* 42 U.S.C. §§ 7475(a), 7479(2)(c)), 7411(a)(4). No new construction or modifications can take place without first receiving a permit. *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 472, 124 S. Ct. at 992.

As it does with all state issuing authorities, the EPA oversees permits issued by EPD in order to ensure they comply with the letter of the law. *See* 42 U.S.C. § 7661d(a)-(b); 40 C.F.R. § 70.8(a). To this end, Title V defines specific procedures governing the EPA's duty to object to defective permits. First, the EPA Administrator is required to object to a permit if the Administrator determines it is not in compliance with the law. 42 U.S.C. § 7661d(b)(1). Second, if the

6

Administrator does not issue an objection during the EPA's permit review period, any person may challenge the Administrator's decision by filing a petition with the EPA. *Id.* § 7661d(b)(2). Title V describes the Administrator's duty to review citizen permit petitions in § 7661d(b)(2):

> The Administrator shall issue an objection . . . if the petitioner *demonstrates* to the Administrator that the permit is not in compliance with the requirements of [the Clean Air Act], including the requirements of the applicable implementation plan.

*Id.* (emphasis added). Thus, if the petitioner successfully demonstrates that a permit does not comply with clean air requirements, the EPA Administrator must issue an objection to the permit. *Sierra Club v. Johnson*, 436 F.3d at 1273.

If the Administrator issues an objection, the proposed permit is sent back to the state permitting authority which must correct the problem; if the problem is not corrected, the EPA will issue the permit itself. *See* 42 U.S.C. § 7661d(b)(3)-(c)). Depending on whether the permit is ultimately issued by the state or the EPA, the permit applicant may contest the final terms through state proceedings, *see id.* § 7661a(b)(6), or federal proceedings, *see id.* § 7607(b).

B.     *Enforcement Mechanisms*

Congress has empowered the EPA with a variety of enforcement mechanisms. In most cases, the enforcement process is initiated with an EPA-

issued violation notice. *See* 42. U.S.C. § 7413. Section 7413 of the Clean Air Act

authorizes the EPA to issue a violation notice:

> Whenever, on the basis of any information available to the
> Administrator, the Administrator finds that any person has violated or
> is in violation of any requirement or prohibition of an applicable
> implementation plan or permit, the Administrator shall notify the
> person and the State in which the plan applies of such finding.

*Id.* § 7413(a)(1). Thirty days after the issuance of a violation notice, the statute

authorizes the EPA to bring a civil action seeking injunctive relief and the

imposition of civil fines. *Id.* § 7413(a)(1)(c)), (b). The statute also includes other

enforcement mechanisms such as issuing an administrative penalty order or an

order requiring compliance. *See id.* § 7413(a)(1)(A)-(B). *But see Tenn. Valley*

*Auth. v. Whitman*, 336 F.3d 1236, 1258 (11th Cir. 2003) (holding provision

authorizing EPA to issue administrative order of compliance violates due process

to the extent noncompliance results in the imposition of severe civil and criminal

penalties without providing any procedures for judicial review).

C.      *The Bowen and Scherer Plants*

For many years, the Bowen and Scherer plants have considered themselves

exempt from clean air requirements used to prevent the significant deterioration of

air quality. In 1999, however, the EPA issued a violation notice to Georgia Power

because it found the Bowen and Scherer plants were operating in violation of PSD

requirements. *See* S. Servs. Co., Notice of Violation, EPA-CAA-2000-04-0006

8

(Nov. 2, 1999). Specifically, it alleged Georgia Power constructed two new steam emission units at the Scherer plant without a permit; at Bowen, it alleged numerous modifications had been made to the plant's boiler, including the replacement and redesign of an economizer in 1992, without obtaining a permit. *Id.* at 8-11. The EPA believed these acts constituted "major modifications" under the Act and had triggered the application of PSD requirements to the plants. The EPA's violation notice announced Georgia Power had "violated and continue[s] to violate" the Clean Air Act. *Id.* at 8, 11.

When Georgia Power did not correct the violations, the United States, on behalf of the EPA, filed an enforcement action in the Northern District of Georgia seeking civil penalties and injunctive relief against Georgia Power. *See United States v. Ga. Power Co.*, No. 1:99-CV-2859-JEC (N.D. Ga. filed Nov. 3, 1999).[1] The allegations in the complaint mirrored the PSD violations listed in the EPA-issued violation notice. Georgia Power responded by denying the allegations and asserting affirmative defenses: it denied wrongdoing at Scherer on the ground that it commenced construction of the units in 1974, and therefore the units were grandfathered out of PSD requirements; at Bowen, it argued the modifications had

---

[1] The parties do not contest the summary of the procedural history of case No. 1:99-CV-2859-JEC as it appears in the EPA's order, *see In re* Ga. Power Co., Order Denying Petition for Objection to Permit (Jan. 8, 2007) (EPA Order). We only rely on that order for the purpose of describing the events in that case, which are not dispositive to our decision.

not resulted in significant net emissions increases and disputed the EPA's methodology for calculating those emissions. The district court administratively closed the case in 2001, pending a potentially-relevant decision from a multi-district litigation panel. In 2002, the court denied without prejudice a motion by the United States to reopen the case. Since that time the United States has not attempted to reopen, and currently "expresses no intent, one way or the other, about seeking to reopen" the case. (Respondent's Br. 53 n.11.)

In 2004, Georgia Power applied to Georgia's state permitting authority, EPD, to renew its Title V operating permits for the Bowen and Scherer plants. It submitted applications without including PSD requirements "because the company does not believe PSD requirements have been triggered at the plants." EPA Order at 5. In turn, EPD issued draft renewal permits without PSD requirements. Petitioners protested the PSD omissions during the public comment period, but EPD issued the proposed permits without the requested modifications. The proposed permits were submitted to the EPA, which did not object, and final permits were issued to Georgia Power without PSD requirements.

Petitioners filed a timely petition with the EPA Administrator seeking to force him to object to the Bowen and Scherer permits on the ground that they lacked PSD requirements and corresponding compliance schedules. The Administrator denied the petition; he acknowledged he was required to object to a

10

permit if "the petitioner demonstrates . . . that the permit is not in compliance with the requirements of [the Clean Air Act]." EPA Order at 6 (quoting 42 U.S.C § 7661d(b)(2)). He also acknowledged that the EPA had issued a violation notice to Georgia Power and filed a related civil enforcement action; however, he noted Petitioners offered no other evidence that the permits were required to contain PSD limits. The Administrator concluded the Petitioners had not demonstrated the permits were out of compliance with the Act because a violation notice and a complaint are merely "initial steps in the process of determining whether the source is in violation of any [Clean Air Act] requirements," and do not "definitively establish" PSD requirements apply to the Bowen and Scherer plants. *Id.* at 7. As relevant factors in his decision, the Administrator explained Georgia Power had contested the PSD issue, and he noted the potential for conflicts between the civil enforcement action the EPA had already filed in federal court and future actions that would likely result from an objection to the permits. *Id.* at 7-8. Under the circumstances, he denied the petition, concluding the EPA was entitled to exercise its discretion in not objecting to the permits because "Petitioner has not sufficiently demonstrated to the Administrator that the permits are out of compliance with the Act." *Id.* at 5.

Sierra Club and the Coosa River Basin Initiative petition this Court for review of the agency order. They maintain the Bowen and Scherer permits are

11

required to contain PSD requirements and corresponding compliance schedules with enforceable remedial measures. They argue the Administrator does not have discretion to refuse to object when the agency has already made administrative findings resulting in a violation notice and the filing of a complaint. The EPA, on the other hand, argues the Administrator offered a reasonable interpretation of 42 U.S.C. § 7661d(b)(2), and this interpretation is entitled to deference. Three entities sought and were granted permission to intervene on behalf of the EPA in this appeal: Georgia Power Company, Oglethorpe Power Corporation (partial owner of the Scherer plant), and EPD (Georgia's permitting authority).

## II. DISCUSSION

This case presents a question of first impression for this Circuit, namely, whether the EPA Administrator has discretion under 42 U.S.C. § 7661d(b)(2) not to object to a permit when the evidence of noncompliance is merely an agency issued violation notice and a related civil complaint. Ultimately, we hold the Administrator has the discretion not to object. To reach this result, we first identify the appropriate standard governing our review, next we discuss the degree of deference to which the Administrator's interpretation of the statute is entitled, and finally we evaluate whether the Administrator's actions were reasonable in light of the Petitioners' attempt to demonstrate noncompliance.

*A. Standard of Review*

12

The EPA's decision cannot be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 496-97, 124 S. Ct. at 1006.[2] "[W]e give deference to a final agency decision by reviewing for clear error, and we cannot substitute our own judgment for that of the agency." *Sierra Club v. Johnson*, 436 F.3d at 1273. Under this standard, "we must consider whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 1273-74 (quotations omitted). As the Supreme Court recently explained, the arbitrary and capricious standard is deferential:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, --- U.S. ----, 127 S. Ct. 2518, 2529-30 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983)). Even a decision of "less than ideal clarity" will be upheld "if the agency's path may

---

[2] "Because the Clean Air Act sets forth no independent standard of review . . . and because an EPA decision not to object to a Title V permit is a final agency decision, we apply the deferential standard of review set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706." *Sierra Club v. Johnson*, 436 F.3d at 1273.

13

reasonably be discerned." *Id.* at 2530 (quotations omitted). Our inquiry must be searching and careful, but the ultimate standard of review is a narrow one.

## B. Degree of Deference

To determine if the EPA's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, we begin by reviewing the statutory provision of Title V which controlled the Administrator's review of the Bowen and Scherer petitions: 42 U.S.C. § 7661d(b)(2). Petitioners believe the plain text required the Administrator to issue objections to the permits. The EPA contends the provision is ambiguous and the Administrator's reasonable interpretation of the statute is entitled to deference.

Agency interpretations of statutes they have responsibility for administering are reviewed using a two-step analysis. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984). First, we must determine, "whether Congress has directly spoken to the precise question at issue." *Id.*, 104 S. Ct. at 2781. If Congress's intent is clear from the statutory language, we must give it effect. *Id.* at 843 n.9, 104 S. Ct. at 2781 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law . . . ."). Second, "if the statute is silent or ambiguous with respect to the specific issue," we must decide whether the agency based its interpretation on a permissible construction of the

statute. *Id.* at 843, 104 S. Ct. at 2782; *Sierra Club v. Johnson*, 436 F.3d at 1274.

"[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. To uphold the EPA's interpretation of a statute, we "need not conclude that the agency construction was the only one it permissibly could have adopted" or even that we would have interpreted the statute the same way the agency did. *Id.* at 843 n.11, 104 S. Ct. at 2782 n.11. However, a reviewing court "must reject administrative constructions . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 143, 104 S. Ct. 2979, 2982 (1984) (quotations omitted). "EPA may not construe the [Clean Air Act] in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 485, 121 S. Ct 903, 918-19 (2001).[3]

---

[3] In *Chevron*, the Supreme Court held a court must give effect to an agency's reasonable interpretation of an ambiguous statute. 467 U.S. at 842-44, 104 S. Ct. at 2781-82. *Chevron* deference, however, does not necessarily apply to every interpretation offered by an agency. Interpretations not the product of "a formal adjudication or notice-and-comment rulemaking . . . which lack the force of law" do not warrant *Chevron*-style deference, but are still "entitled to respect . . . to the extent that those interpretations have the power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63 (2000) (quotations and citations omitted). We need not identify the precise level of deference in the instant matter since we are persuaded that the EPA's position would survive even the least deferential degree of review. *Cf. Sierra Club v. U.S. Army Corps. of Eng'rs*, 508 F.3d 1332, 1334 n.1 (11th Cir. 2007) (declining to decide *Chevron* deference issue). *But see Citizens Against Ruining the Env't v. EPA*, --- F.3d ----, Nos. 07-3197, 07-3198 & 07-3199, 2008 WL 2877516, at *6 (7th Cir. July 28,

The statutory language at the heart of this dispute contains both a discretionary and a nondiscretionary component: "The Administrator *shall* issue an objection . . . if the petitioner *demonstrates* to the Administrator that the permit is not in compliance with the requirements of [the Clean Air Act] . . . ." 42 U.S.C. § 7661d(b)(2) (emphasis added). Congress's use of the word "shall" creates a nondiscretionary duty for the Administrator; it plainly mandates an objection whenever a petitioner demonstrates noncompliance. The unambiguous nature of this provision is well recognized. *See Sierra Club v. Johnson*, 436 F.3d at 1280; *Citizens Against Ruining the Env't v. EPA*, 2008 WL 2877516, at *6; *N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 333 (2d Cir. 2003) (referring to this as the "nondiscretionary part" of the statute).[4]

Easier cases than the one presented here have involved situations where the EPA concedes a permit is defective, yet still withholds its objection—an

_____

2008) (applying *Chevron* deference to EPA's interpretation of 42 U.S.C. § 7661d(b)(2)).

[4] If the intent of Congress were not otherwise clear from the plain language of the text, "the conference report for the 1990 amendments settles it," *Sierra Club v. Johnson*, 436 F.3d at 1280:

> This section sets out clearly the procedures required of EPA in reviewing permits. Simply put, the Administrator is required to object to permits that violate the Clean Air Act. This duty to object to such permits is a nondiscretionary duty. Therefore, in the event a petitioner demonstrates that a permit violates the Act, the Administrator must object to that permit.

136 Cong. Rec. S16,895, 16,944 (1990); *see also N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d at 333 n.12 (quoting same).

indefensible position under existing law. *See Sierra Club v. Johnson*, 436 F.3d at 1280 (holding EPA required to object to permits where state agency admittedly failed to follow public notice procedures); *N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d at 333-34 (concluding Administrator had no discretion to withhold objection where EPA conceded draft permits did not comply with Title V). This Circuit has cautioned "EPA is not a board of pardons. Its duty is to enforce requirements, not to grant absolution to state agencies that have violated them." *Sierra Club v. Johnson*, 436 F.3d at 1280.

At the same time, it is undeniable § 7661d(b)(2) also contains a discretionary component: it requires the Administrator to make a judgment of whether a petition demonstrates a permit does not comply with clean air requirements. Neither the Clean Air Act nor its regulations define the term "demonstrates" or give context to how the Administrator should make this judgment. It is this aspect of the statute we consider unclear. Looking to the plain meaning of the word "demonstrate," which is "to show clearly" or "to prove or make clear by reasoning or evidence," Merriam-Webster's Collegiate Dictionary 308 (10th ed. 1999), does not resolve important questions that are part and parcel of the Administrator's duty to evaluate the sufficiency of a petition, for example, the type of evidence a petitioner may present and the burden of proof guiding the Administrator's evaluation of when a sufficient demonstration has occurred. Thus, we conclude the statute's silence on

17

these important issues means Congress has delegated to the EPA some discretion in determining whether, in its expert opinion, a petitioner has presented sufficient evidence to prove a permit violates clean air requirements. *See N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d at 333 n.11 ("There clearly is *some* room for the exercise of agency expertise in [§ 7661d(b)(2)], which requires petitioner to make a demonstration to the EPA . . . .").

Reinforcing our conclusion is the basic principle that when it comes to interpreting provisions of the Clean Air Act, "[c]ontext counts." *Envtl. Defense v. Duke Energy Corp.*, --- U.S. ----, 127 S. Ct. 1423, 1433 (2007). Viewing § 7661d(b)(2) in context, we think the ambiguity is a product of the broad role the provision plays within the Title V permitting scheme. The provision is procedural and governs a wide range of disputes, *i.e.*, any clean air violation that is not addressed by a proposed operating permit. Given the large number of potential issues that can be challenged under this provision, it makes sense Congress did not attempt to impose a one-size-fits-all approach and instead elected to afford the agency some discretion in evaluating the merits of permitting disputes.

We do not attempt today to define precisely the burdens facing a petitioner under § 7661d(b)(2); instead, we merely note that due to ambiguity the "EPA's construction [of the statute] need do no more than fall within the limits of what is reasonable . . . ." *Duke Energy Corp.*, 127 S. Ct. at 1434; *accord Citizens Against*

18

*Ruining the Env't*, 2008 WL 2877516, at \*6 ("[B]ecause 'demonstrate' is undefined, we need only determine whether the Administrator's interpretation is based on a permissible construction of the statute." (quotations omitted)). In this way, the Administrator's reasonable interpretation of whether a petition demonstrates noncompliance is entitled to deference. *See Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Naturally, the type of demonstration that can reasonably be required by the agency will depend on the law and facts underlying the particular permitting dispute.

In summary, because we conclude § 7661d(b)(2) is ambiguous when it comes to defining the type of demonstration required to trigger the Administrator's duty to object, we are willing to defer to a reasonable interpretation by the agency as to when a petitioner has sufficiently demonstrated noncompliance with PSD requirements. But where a petition successfully demonstrates noncompliance, an objection by the Administrator must ensue. With this in mind, we turn to whether the Administrator's decision here—that Petitioners made an insufficient demonstration of permit noncompliance—was a reasonable interpretation in light of the evidence presented.

C. *Petitioners' Attempt to Demonstrate Permit Noncompliance*

The Petitioners attempted to demonstrate the Georgia Power permits did not comply with PSD requirements by reminding the Administrator of the agency's

earlier PSD-related actions. The Administrator took note of the agency's violation notice and civil enforcement action, but concluded these were merely early steps in the process of determining whether a violation had, in fact, occurred. Thus, he concluded Petitioners' evidence alone was not sufficient to satisfy their burden of demonstrating the permits were out of compliance with the Act (*i.e.*, that PSD requirements apply to the Bowen and Scherer plants and therefore should have been included in the plant's operating permits). Whether the Administrator's position is reasonable depends on the legal significance of a violation notice and the initiation of an enforcement action.

The EPA has broad authority to issue violation notices; it may do so, "[w]henever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit . . . ." 42 U.S.C. § 7413 (a)(1). As the text of § 7413 suggests, no adjudication of the PSD issue was required before a violation notice was issued to Georgia Power; rather, the Administrator simply had to *find* that a violation occurred. The Administrator's finding could have been based on "any information available"—an exceedingly low standard. *See Tenn. Valley Auth.*, 336 F.3d at 1241. Under that standard, "the Administrator need only have a staff report, newspaper clipping, anonymous phone tip, or anything else that would constitute 'any information.'"

20

*Id.* (noting any information available standard is less rigorous than probable cause standard required for the issuance of search warrants).

Although § 7413 talks in terms of the Administrator making a finding, it merely describes the EPA's process for leveling allegations against any party it perceives to be violating clean air requirements. The provision also helps guarantee that a party receives notice of the accusations leveled against them prior to the EPA taking further enforcement action. *See* 42 U.S.C. § 7431(a)(1). For these reasons, we find reasonable the EPA's position that a violation notice "is simply one early step in the EPA's process of determining whether a violation has, in fact, occurred." EPA Order at 7.

Similarly, the initiation of a civil enforcement action against Georgia Power did not resolve the applicability of PSD limits to Georgia Power's permits. The Act provides that thirty days after the EPA has issued a violation notice it may then "bring a civil action" to force compliance. 42 U.S.C. § 7413(a)(1)(c)). While we do not doubt the sincerity behind the allegations contained in the complaint filed against Georgia Power, a complaint does not in-and-of itself prove the facts plead. *See* Fed. R. Civ. P. 8(a). This is not a case where a civil enforcement action has resulted in a determination of the merits of the substantive dispute. From all accounts, the PSD issue has been fiercely contested by Georgia Power, and the district court's adjudication of the issue has stalled short of resolving the PSD

dispute. For all these reasons, we find unpersuasive Petitioners' attempt to elevate the EPA's issuance of a violation notice or the initiation of a civil enforcement action to the level of a final resolution of the PSD issue.

The Petitioners rely heavily on the Second Circuit's *New York Public Interest Research Group v. Johnson*, 427 F.3d 172 (2d Cir. 2005) (*NYPIRG v. Johnson*). *NYPIRG v. Johnson* is a similar case that reached an opposite result. There, the Second Circuit was faced with an arguably weaker petition than the one before us today: a PSD-related violation notice and civil complaint had been issued by a *state* permitting authority (as opposed to by the EPA itself), and petitioners relied on those state actions as evidence requiring the EPA Administrator to object to the permits. *See id.* at 179-80. The Second Circuit held this evidence constituted a "sufficient demonstration to the Administrator of non-compliance for purposes of the Title V permit review process," *id.* at 180, and required the EPA to issue an objection, *id.* at 186.

The *NYPIRG v. Johnson* court appears to have been persuaded by four main arguments: (1) before a violation notice can be issued an administrative *finding* must be made that the Act has been violated; (2) while "ordinarily we may understand a complaint as a series of allegations whose truth is ascertained over the course of a proceeding," an agency-issued complaint is more significant due to the procedures an agency undertakes before initiating an enforcement action; (3) the

22

agency is in a "privileged position to monitor and regulate" and thus could not reasonably claim to be uncertain as to what emission levels apply; and (4) private citizens should not be required to duplicate an agency's fact finding when a violation notice and complaint have been issued. *See id.* at 181-82.

None of these arguments persuade us here. Petitioners have urged us to give special significance to the Administrator's *findings* that lead to the violation notice and complaint; yet, peering beyond the statute's use of the word "finds" reveals the only statutory prerequisite to leveling allegations of a violation is that they be based on "any information available." 42 U.S.C. § 7413(a)(1). We also decline to give talismanic significance to the allegations contained in an agency-issued complaint; like any other complaint, the truth of the allegations it contains must be proven over the course of a proceeding. And while it is true the EPA was in a privileged position to monitor the acts of the Bowen and Scherer plants when it issued a detailed violation notice (over nine years ago), the agency maintains a privileged position for assessing the current strength of its case and evaluating whether the PSD issue has been definitely resolved.[5]

---

[5] Petitioners also label the EPA's position as arbitrary because they say it conflicts with a position the agency took when it objected to the lack of a compliance schedule in permits issued to the Gallatin Steel Company. *See NYPIRG v. Johnson*, 427 F.3d at 182. No one disputes that a compliance schedule would be required in the Georgia Power permits *if* PSD requirements apply to the Bowen and Scherer plants; the problem here is, unlike the situation in Gallatin Steel, the parties remain locked in a protracted dispute over the applicability of those requirements.

Finally, *NYPIRG v. Johnson* presents an interesting policy argument for avoiding the inefficiencies associated with burdening private citizens with the task of demonstrating a violation; however, this policy argument threatens to render meaningless the statutory requirement that private citizens *demonstrate* noncomplaince. Had Congress intended the Administrator to object to an operating permit every time a violation notice is issued, it could have easily made that an explicit part of the Title V permit review process. *See id.* § 7661d. It did not. Instead it chose to require private citizens to "demonstrate" a violation, and at least in this case, the agency was entitled to conclude that a mere reminder of its past actions was an insufficient demonstration. *Cf. Citizens Against Ruining the Env't*, 2008 WL 2877516, at *7 (concluding Clean Air Act "allows the EPA reasonable discretion to determine that the petition failed to demonstrate noncompliance" where there is "contested evidence of a potential violation requiring further investigation and analysis.").

In summary, we conclude the EPA has offered a reasonable interpretation of the statute that deserves deference: Title V operating permits are required to contain all applicable clean air requirements, *see* 42 U.S.C. § 7661c(a), and under § 7661d(b)(2) a petitioner must demonstrate to the Administrator that a permit does not contain a requirement that is applicable to that permit's source. Here, Petitioners only offered evidence that the EPA had initiated proceedings to resolve

24

the applicability of PSD requirements to the Bowen and Scherer plants. This evidence, without more, was insufficient to trigger the Administrator's duty to object to the permits because the EPA had discretion to reasonably conclude the applicability of PSD limits to the Bowen and Scherer plants was still very much unresolved. Therefore the EPA Administrator did not act arbitrarily in declining to object to the Bowen and Scherer permits, which did not contain PSD-related limits or compliance schedules.

## III. CONCLUSION

The EPA Administrator's order is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; therefore, we deny the petition.

**DENIED.**