[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11972

_____

CAHABA RIVERKEEPER, et al.,

Petitioners,

versus

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents.

_____

On Petition for Review of Order of the
United States Environmental Protection Agency

_____

(September 12, 2019)

Before ED CARNES, Chief Judge, BRANCH, Circuit Judge, and GAYLES,[*]
District Judge.

GAYLES, District Judge:

---

[*] Honorable Darrin P. Gayles, United States District Judge for the Southern District of
Florida, sitting by designation.

This case places us squarely into another debate of whether United States Environmental Protection Agency's (the "EPA")[1] action (or inaction) was arbitrary, capricious, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The parties dispute whether the EPA has sufficiently supervised how Alabama protects its waterways from pollutants. The EPA gets this supervisory authority from the Clean Water Act, 86 Stat. 816, as amended, 33 U.S.C. §§ 1251–1388 (2018) ("CWA"), which allows it to partner with Alabama to implement appropriate protections. The EPA can withdraw from the partnership if it finds that there are regulatory violations with Alabama's program. Petitioners claim that the EPA must do that here because—and it is not disputed that—Alabama's administration of its program has not always complied with federal law. The EPA disagreed, and Petitioners sued.

The primary question on appeal, therefore, is whether the EPA has discretion not to commence withdrawal proceedings under 40 C.F.R. § 123.64(b) even if it finds that a state's National Pollutant Discharge Elimination System ("NPDES") permit program has not always complied with the requirements of the CWA. Because no statute or regulation requires otherwise, the Court concludes that the answer is yes.

---

[1] The Court uses the acronym "EPA" to refer to both the U.S. Environmental Protection Agency and its Administrator.

# I. BACKGROUND

## A. The Clean Water Act and Regulations

The Clean Water Act aims to eliminate the discharge of harmful pollutants into U.S. waters. See 33 U.S.C. § 1251(a). It does so by partnering with the states through a system of grants, projects, and standards; the creation of special oversight offices; and permit and licensing programs, see id. §§ 1251–1346, including the NPDES, id. § 1342. By default, the CWA authorizes the EPA to issue NPDES permits. Id. § 1342(a)(1). But to "recognize, preserve, and protect the primary responsibilities and rights of States" over environmental issues, id. § 1251(b), the statute sets forth a mechanism for states to assume responsibility for issuing NPDES permits. Id. § 1342(b).

Under the CWA, a state wishing to operate its own NPDES permit program submits a proposal that includes a program description and other documentation to the EPA. Id. The EPA Administrator then "shall approve [the] submitted program unless he determines that adequate authority does not exist" to, among other requirements, "insure that the public . . . receive[s] notice of each application for a permit" and "[t]o abate violations of the permit or the permit program, including civil and criminal penalties . . . ." Id. § 1342(b), (b)(3), (b)(7) (emphasis added). State permit programs must comply with the EPA regulations detailed in its state-program requirements. See id. § 1342(c)(2); 40 C.F.R. pt. 123.

3

Four statutory and regulatory requirements for state permit programs are relevant here: (1) public notice, (2) board membership, (3) inspections of major dischargers, and (4) the state's enforcement authority.[2] State programs must "at all times be in accordance with [§ 1342] and guidelines promulgated pursuant to section 1314(i)(2) . . . ." 33 U.S.C. § 1342(c)(2). Further, the EPA must withdraw a state's authorization to run its own NPDES permit program if it determines, after conducting withdrawal proceedings and giving the state a chance to take corrective action, that the program has fallen out of compliance. See id. § 1342(c)(3). Per the regulation, the EPA may commence withdrawal proceedings on its own "or in response to a petition from an interested person . . . ." 40 C.F.R. § 123.64(b)(1). The EPA must respond in writing to any such petition and "may conduct an informal investigation of the allegations in the petition to determine whether cause exists to commence proceedings . . . ." Id.

### B. Alabama's NPDES Permit Program

In 1979, the EPA authorized the Alabama Department of Environmental Management ("ADEM") to administer Alabama's NPDES permit program. As

---

[2]     40 C.F.R. § 123.25(a)(28) (public notice); 40 C.F.R. § 124.10(c)(2), (d)(1)(vii) (public notice); 33 U.S.C. § 1314(i)(D) (board membership); 40 C.F.R. § 123.25(c)(1)(i) (board membership); 40 C.F.R. § 123.26(e)(5) (inspections of major dischargers); 40 C.F.R. § 123.27(a)(3)(i) (the state's enforcement authority).

4

required by 40 C.F.R. § 123.21(a)(4), the state and the EPA entered into a Memorandum of Agreement, which may be updated periodically. See § 123.24(c).

Petitioners here are seven environmental groups: Cahaba Riverkeeper; Choctawhatchee Riverkeeper, Inc.; Friends of Hurricane Creek; Black Warrior Riverkeeper, Inc.; Sierra Club Alabama Chapter; Friends of the Locust Fork River; and Alabama Rivers Alliance (collectively, "Petitioners"). All seven are Alabama nonprofit, member corporations that advocate for the environmental protection of particular waters. On January 14, 2010, Alabama Riverkeepers Alliance and 13 other environmental groups, including Petitioners, petitioned the EPA to commence proceedings to withdraw Alabama's authority to administer the NPDES permit program. The groups cited 26 regulatory and statutory violations as grounds for withdrawal. Complying with the EPA's request, ADEM responded to the petition on April 13, 2010, addressing each of the 26 alleged violations in turn.

On April 9, 2014, the EPA issued its interim response to the petitions, indicating that it would not commence withdrawal proceedings based on 20 of the 26 grounds but would defer a decision on the remaining six.[3]

Petitioners appealed the interim response to this Court. Cahaba Riverkeeper v. EPA, 806 F.3d 1079 (11th Cir. 2015). The Court held that its statutorily-given

---

[3]    The EPA considered the petition simultaneously with three other petitions to withdraw Alabama's authority to administer the NPDES program.

5

jurisdiction to review "any determination" by the EPA regarding a state NPDES program was limited to final agency actions. Id. at 1084; see 33 U.S.C. § 1369(b)(1) (vesting jurisdiction in the Courts of Appeals to review the EPA's action "in making any determination as to a State permit program submitted under section 1342(b) of [Title 33] . . . ."). The Court dismissed the appeal without prejudice, noting that "[t]he organizations will . . . be able to appeal once the EPA resolves the outstanding matters and makes a definitive decision on the relief requested by the petitions." Cahaba Riverkeeper, 806 F.3d at 1084.

On January 11, 2017, the EPA issued its final response to the petitions, affirming its previous refusal to commence withdrawal proceedings against Alabama. Petitioners now seek review of that final response. They argue that the EPA's refusal to commence withdrawal proceedings based on four specific statutory and regulatory grounds was arbitrary and capricious, an abuse of discretion, or contrary to law.

## II. JURISDICTION

The Courts of Appeals have original jurisdiction to review the EPA's action "in making any determination as to a State [NPDES] program . . . ." 33 U.S.C. § 1369(b)(1); see Friends of the Everglades v. EPA, 699 F.3d 1280, 1285 (11th Cir. 2012). Before we can exercise that jurisdiction, we must ensure that the action

6

before us is a "case" or "controversy" "of the justiciable sort referred to in Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

The justiciability analysis begins with the question of Petitioners' standing.[4] Organizations have standing to sue on behalf of their members only when the members themselves "would otherwise have standing to sue in their own right." Hunt v. Wa. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). An individual has standing to sue when "(1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000). But an individual can enforce a procedural right, such as "the right to challenge agency action unlawfully withheld," "without meeting all the normal standards for redressability and immediacy." Massachusetts v. EPA, 549 U.S. 497, 517–18 (2007) (citations and quotation marks omitted). Instead, "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly

---

[4] Amicus Curiae Manufacture Alabama, Inc., contends that this case is not justiciable because Petitioners lack standing to bring it. Manufacture Alabama argues that none of the Petitioners' members have standing to sue and that, as a result, neither do Petitioners.

7

harmed the litigant." Id. at 518 (citation omitted); see Lujan, 504 U.S. at 573 n.8 (explaining that an individual "assuredly can" enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing"); Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006) ("To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests.").

To prove standing, Petitioners submitted declarations from three of their members: (1) John Wathen of Friends of Hurricane Creek; (2) Michael William Mullen of Choctawhatchee Riverkeeper, Inc.; and (3) Myra Ann Crawford of Cahaba Riverkeeper. Each of these individuals serves as the "Riverkeeper" (or, in the case of Wathen, the "Creekkeeper") for their respective waterways, and they have been swimming, kayaking, and fishing in those waterways for years. They allege that the EPA's decision not to commence withdrawal proceedings threatens their enjoyment of their waterways. They also claim to have "witnessed the pollution" of the waterways and "attribute much of this pollution to poor regulation of pollution sources under the Alabama NPDES permit program . . . and poor oversight of the Alabama NPDES permit program by EPA." They also state that

8

they would "recreate in these waters more and enjoy [their] recreational activities more, if EPA required that Alabama's NPDES program fully complied with the minimum requirements of 40 C.F.R. pt. 123."

Those statements are enough to establish injury in fact. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)); see also Sierra Club v. Johnson (Johnson I), 436 F.3d 1269, 1279 (11th Cir. 2006) (concluding that the plaintiff's "injury in fact exists as a result of concerns about pollution, concerns that arise because the failure to use one of the mandated public participation procedures leaves him uncertain about whether pollution is being emitted in illegal quantities").

The declarations are also adequate to show that the EPA's decision not to commence withdrawal proceedings is a cause of the alleged injuries. "The proper focus on causation is not harm to the environment, but harm to the plaintiffs." Jacobs, 463 F.3d at 1172. For instance, in Jacobs, where a coalition of environmental groups challenged the U.S. Forest Service's change to certain forest plans, this Court held that the plaintiffs had standing to sue because their rights under the National Environmental Policy Act ("NEPA") had been violated, and

9

"[s]ince the Forest Service (according to [the plaintiffs]) failed to follow NEPA, it [was] clear that the Forest Service caused [the plaintiffs'] alleged injury." Id. at 1173. And that, this Court said, "is the extent of [the plaintiffs'] burden to establish causation." Id.

So too here. Like the plaintiffs in Jacobs, Wathen, Mullen, and Crawford all trace their injuries to the EPA's decision not to commence withdrawal proceedings. According to them, if the EPA had commenced withdrawal proceedings, then Alabama's program would have been brought into compliance with the minimum requirements of the Clean Water Act. That, in turn, would have given Petitioners greater enjoyment of the waterways they protect. Those allegations are enough to show causation. See id.; see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 650 (2007) (explaining that the NPDES program "is designed to prevent harmful discharges into the Nation's waters").

"The final piece of constitutional standing is redressability." Jacobs, 463 F.3d at 1173. If the Court concludes that the EPA has failed to follow the requirements of the Clean Water Act and 40 C.F.R. pt. 123, as the Petitioners allege, then "that injury is plainly redressable[,]" id., because the APA requires that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings,

10

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance law . . . [,]" 5 U.S.C. § 706(1), (2)(A).

In short, because Wathen, Mullen, and Crawford have established standing to sue in their individual capacities, the organizations that are suing on their behalf also have standing. See Hunt, 432 U.S. at 343. And "[s]o long as one party has standing, other parties may remain in the suit without a standing injury." Jacobs, 463 F.3d at 1170.

### III. STANDARD OF REVIEW

Judicial review of an agency's interpretation of the statute it administers is a two-step inquiry. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." Id. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," the Court will give effect to an agency's interpretation so long as it is a "permissible construction of the statute." Id. at 843.

Similarly, an agency's interpretation of its own regulation will be upheld unless it is "plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens

11

Council, 490 U.S. 332, 359 (1989)) (internal quotation marks omitted); see also Kisor v. Wilkie, — U.S. —, 139 S. Ct. 2400, 2416 (2019) (affirming that "the agency's reading must fall 'within the bounds of reasonable interpretation'") (quoting Arlington v. FCC, 569 U.S. 290, 296 (2019)). Under this standard, the EPA enjoys the "power to resolve ambiguities in [its] own regulations," but must not act contrary to regulations passed with the benefit of notice and comment. Auer, 519 U.S. at 463. "This deferential standard applies as long as the agency does not promulgate 'a parroting regulation' that does nothing more than 'paraphrase the statutory language' that it should be implementing." Johnson I, 436 F.3d at 1274 (quoting Gonzales v. Oregon, 546 U.S. 243, 257 (2006)).

When applying these principles of deference, the agency's action (or inaction) will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A); see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971), abrogated by Califano v. Sanders, 430 U.S. 99 (1977). Though the standard is deferential, and the Court will not "substitute our own judgment for that of the agency," the Court "must consider whether an agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Johnson I, 436 F.3d at 1273–74 (quoting Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996)); see also Mendoza v. Sec'y, Dep't of Homeland Sec., 851 F.3d

12

1348, 1353 (11th Cir. 2017). The Court will find an agency action to be arbitrary and capricious only where "(1) the agency relied on factors which Congress has not intended it to consider, (2) the agency failed to consider an important aspect of the problem, (3) the agency explained its decision in a way that runs counter to the evidence, or (4) the action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Mendoza, 851 F.3d at 1353 (internal quotation marks omitted) (citations omitted).

## IV. DISCUSSION

The central question in this appeal is whether the EPA acted within the bounds of permissible discretion. The antecedent issue, therefore, is the scope of the EPA's discretion to commence withdrawal proceedings. The parties equally misrepresent the other's position. Petitioners contend that the EPA seeks unlimited discretion; the EPA claims that Petitioners argue for no discretion.

## A. Scope of EPA Discretion

The CWA's structure emphasizes the supervisory role the EPA is to play and the "restraint" the agency should exercise when doing so. See Save the Bay, Inc. v. Administrator of EPA, 556 F.2d 1282, 1287 (11th Cir. 1977). Both its structure and text make clear that states must maintain primary responsibility for environmental issues. See 33 U.S.C. § 1251(b), (g). Revoking permit authority is a drastic remedy, not intended for just any statutory or regulatory violation; "only the most

13

egregious flouting of federal requirements in the context of an individual permit could justify that sanction." See Save the Bay, 556 F.2d at 1290 (expressing "some skepticism whether a state authority's unsatisfactory handling of a single permit would ever warrant [the] EPA's revocation of NPDES authority, much less judicial reversal of a decision not to revoke").

At the heart of this dispute over the scope of the EPA's discretion lies the following statutory language:

> Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

33 U.S.C. § 1342(c)(3). Whether the EPA's decision to commence withdrawal proceedings is discretionary is a question of first impression in this Court. But as the Court noted in this case's earlier incarnation, "most courts passing on the issue have ruled that the EPA's decision as to whether to commence withdrawal proceedings is a discretionary one." Cahaba Riverkeeper, 806 F.3d at 1084 (citing Sierra Club v. EPA, 377 F. Supp. 2d 1205, 1208–209 (N.D. Fla. 2005)).

The statutory text at issue encompasses "both a discretionary and a nondiscretionary component." Cf. Sierra Club v. Johnson (Johnson II), 541 F.3d 1257, 1265 (11th Cir. 2008) (noting that the provision at issue in the Clean Air Act

14

"contain[ed] both a discretionary and nondiscretionary component"). "Congress's use of the word 'shall' creates a nondiscretionary duty for the Administrator; it plainly mandates" the withdrawal of state permit authority under particular conditions. Id. "At the same time, it is undeniable [§ 1342(c)] also contains a discretionary component: it requires the Administrator to make a judgment of whether a petition demonstrates a [state program] does not comply with clean [water] requirements." Id. at 1266. In this case, as in Johnson II, when faced with a petition to commence withdrawal proceedings, the EPA must decide whether petitioners have made a sufficient showing to warrant withdrawal proceedings. See id.; see also N.Y. Pub. Interest Research Grp. v. Whitman, 321 F.3d 316, 333 n.11 (2d Cir. 2003) ("There clearly is some room for the exercise of agency expertise in [the statutory text], which requires petitioner to make a demonstration to the EPA, but none of the questions that could arise under the exercise of the EPA's judgment—such as, perhaps, questions of the burdens facing a petitioner—have arisen in this case.").

As one district court in this Circuit has explained, "neither the [CWA] nor the regulations impose any prescribed method by which, or specific time within which, the EPA must evaluate a complaint or evidence of a state's noncompliance and make a determination." Sierra Club, 377 F. Supp. 2d at 1208. This leaves courts to evaluate simply whether the EPA has made a "reasonable inquiry . . .

15

within a reasonable time . . . [and] these are standards that ring of discretion." Id.; see also id. at 1208–09 (comparing cases determining whether commencement of withdrawal proceedings is discretionary).

While the EPA's decision whether to commence withdrawal proceedings is discretionary, the agency's discretion is not boundless as it must faithfully enforce the CWA and its implementing regulations. See 33 U.S.C. § 1342(c). And the regulations enumerate the conditions under which withdrawal is appropriate. Even so, the regulations indicate that the decision to withdraw a state's NPDES authority is ultimately a discretionary one: "The Administrator may withdraw program approval when a State program no longer complies with the requirements of [the implementing regulations], and the State fails to take corrective action." 40 C.F.R. § 123.63(a) (emphasis added). In other words, the Administrator may withdraw authority under certain conditions but is not compelled to do so. The EPA's interpretation of the regulation is consistent with the statute.

Petitioners argue that the EPA's decision to commence withdrawal proceedings (or not) must be based solely on the agency's determination of whether "cause" exists to commence proceedings. As support, Petitioners point to a different regulatory provision, which states:

> The Administrator may order the commencement of withdrawal proceedings on his or her own initiative or in response to a petition from an interested person alleging failure of the State to comply with the requirements of this part as set forth in § 123.63 . . . . He may conduct

16

an informal investigation of the allegations in the petition to determine whether cause exists to commence proceedings under this paragraph . . . .

40 C.F.R. § 123.64(b)(1).

Petitioners argue that "cause . . . to commence proceedings" means cause "to find that the State program is not being administered in accordance with the minimum requirements of 33 U.S.C. § 1342 and 40 C.F.R. pt. 123." According to Petitioners, if the EPA determines that a program is not in compliance, then "cause" exists to commence withdrawal proceedings. And that cause determination, they assert, is tied to the first sentence in § 123.64(b)(1): "The Administrator <u>may</u> order the commencement of withdrawal proceedings on his or her own initiative or in response to a petition from an interested person alleging failure of the State to comply with the requirements of this part." (emphasis added).

Petitioners argue that the use of the word "may" does not give the EPA unbridled discretion, but instead means only that the EPA has a choice to grant or deny the petition. But according to Petitioners, it is not much of a choice. They insist that because the EPA "must conform to the requirements of C.F.R. 40 § 123.64(b)(1)," everything turns on the EPA's decision about whether the program is in compliance. If the EPA decides compliance is lacking, Petitioners say, then "cause" exists to commence withdrawal proceedings.

17

This Court is not persuaded. The regulation does not define what "cause . . . to commence proceedings" means, and it certainly does not define it the way Petitioners have. The Court will defer to the EPA's contrary interpretation "so long as the interpretation sensibly conforms to the purpose and wording of the regulations." Johnson I, 436 F.3d at 1274 (quoting Legal Envtl. Assistance Found., Inc. v. EPA, 276 F.3d 1253, 1262 (11th Cir. 2001)). That is the case here. Moreover, the EPA has long rejected the idea that "program withdrawal should be mandatory for any violation by a State" because "[s]uch a requirement would be draconian." 45 Fed. Reg. 33,384 (1980); see Barnhart v. Walton, 535 U.S. 212, 220 (2002) ("[T]his Court will normally accord particular deference to an agency interpretation of 'longstanding' duration.") (quoting North Haven Bd. of Ed. v. Bell, 456 U.S. 512, 522 n.12 (1982)).

This Court need not pinpoint the precise conditions under which the EPA should exercise its discretion to initiate withdrawal proceedings. It is enough to observe that the EPA is not required by statute or regulation to commence withdrawal proceedings over any single violation. See 33 U.S.C. § 1342(c)(3); 40 C.F.R. § 123.63(a). Petitioners concede this point. The regulations further reinforce broad agency discretion over the decision to withdraw authority. See 40 C.F.R. § 123.63(a) (listing circumstances for which the Administrator may withdraw program approval). The EPA, however, may not absolve states of their obligations

18

under the CWA. See Johnson I, 436 F.3d at 1280 ("EPA is not a board of pardons. Its duty is to enforce requirements, not to grant absolution to state agencies that have violated them.").

So, all that remains here is whether the EPA reasonably exercised its discretion to refuse to commence withdrawal proceedings. Petitioners point to four violations of the EPA's regulations (and one corresponding violation of the CWA) that Petitioners say justified such action. But when considering each argument under the deference framework enumerated above, this Court cannot agree. 5 U.S.C. § 706(1), (2)(A) (courts shall "hold unlawful" agency actions "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"); see also Christensen v. Harris Cnty., 529 U.S. 576, 588 (2000) (noting that Auer deference applies to an agency's interpretation of a regulation "when the language of the regulation is ambiguous").

### B.  Discharge Notices

Before issuing an NPDES permit, the state permit authority must publish "a notice in a daily or weekly newspaper within the area affected by the facility or activity . . . ." 40 C.F.R. § 124.10(c)(2)(i). The notice must include, among other information, "a general description of the location of each existing or proposed discharge point and the name of the receiving water . . . ." Id. § 124.10(d)(vii).

19

Petitioners argue that Alabama's notices are insufficient because, while the notices identify the receiving water, they do not give a general description of the location of existing or proposed discharge points. Instead, Alabama's published notices refer readers to a freely accessible government website that gives greater information about the proposed discharge points and permit. Petitioners argue that this notice system runs contrary to the regulatory requirements. But the EPA disagrees; it concluded that withdrawal proceedings were unnecessary because Alabama's notice procedures, in the EPA's view, "achieves the goals of the regulatory requirement . . . ." In effect, the EPA determined that ADEM substantially complied with federal regulations.

Petitioners argue that Alabama's procedure is not only contrary to the plain regulatory language, but does not actually achieve the regulatory goal, because one-third of Alabama households lack high-speed internet access. While the EPA does not dispute this, it notes that not all Alabamians have newspaper access either.

The EPA agrees that, per its regulations, public notices must contain a general description of the location of discharge points. The agency nevertheless determined that Alabama's public-notice procedure did not merit withdrawal proceedings, deciding instead that the more appropriate regulatory oversight action was to "encourage ADEM to supplement its public notices with more specific information." As explained above, the decision whether to commence withdrawal

20

proceedings is one the CWA and regulations give to the EPA. So even if Alabama's imperfect notice procedure does not fully comply with the CWA, the EPA's decision not to commence withdrawal proceedings was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

### C. Board Conflicts

The CWA charges the EPA with promulgating a regulatory "requirement that no board or body which approves permit applications or portions thereof shall include, as a member, any person who receives, or has during the previous two years received, a significant portion of his income directly or indirectly from permit holders or applicants for a permit[]." 33 U.S.C. § 1314(i)(D). But the CWA does not define "board or body," leaving open the question of whether any conflict prohibits membership or whether recusal in specific instances satisfies the requirement. See Chevron, 467 U.S. at 843 (holding that deference to an agency's interpretation applies where a statute is ambiguous). To clarify that ambiguity, the EPA regulation elaborates on the requirement to include "any individual, including the Director, who has or shares authority to approve all or portions of permits either in the first instance, as modified or reissued, or on appeal." 40 C.F.R. § 123.25(c)(1)(i).

21

The board members of Alabama's NPDES permit program must annually complete a NPDES Conflict of Interest Disclosure Form, disclosing any income received from permit holders or applicants. "Conflicted members" must then complete and file a General Recusal Form, recusing themselves from voting on "any NPDES or Water Pollution Control related matters." The Alabama Environmental Management Commission indicates which matters require recusal during meetings, and those members who are conflicted do not participate in deciding those matters. Additionally, Alabama requires the Chair of the Commission, if conflicted, to defer to the Vice Chair on NPDES matters.

The EPA's regulatory definition of "board or body" clearly allows for the recusal policy that Alabama has implemented: recused members do not "share[] authority to approve all or portions of permits either in the first instance, as modified or reissued, or on appeal." 40 C.F.R. § 123.25(c)(1)(i). And the regulation does not simply parrot statutory text, but rather responds to a genuine ambiguity in the text about whether "a board or body" consists of only those members who decide NPDES matters or all members of a "board or body," some of who decide NPDES matters. See Johnson I, 436 F.3d at 1274. Because the EPA's application of its regulatory definition to Alabama's recusal policy is reasonable and the regulation responds to a genuine statutory ambiguity rather than parroting statutory text, the EPA's decision not to initiate withdrawal proceedings on this ground was a

22

reasonable one.[5] Auer, 519 U.S. at 461. And accordingly, it was also not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

## D.  Annual Inspections

The EPA regulation here requires that "State NPDES compliance evaluation programs shall have procedures and ability for . . . [i]nspecting the facilities of all major dischargers at least annually." 40 C.F.R. § 123.26(e)(5). To free resources for other environmental issues, the EPA's 2007 National Compliance Monitoring Strategy set a goal of inspecting major dischargers biennially.

According to the plain language of the regulation, state programs must have "procedures and ability" for annual inspections, not that annual inspections occur. Recognizing as much, Petitioners argue that because the resources for annual inspections are diverted to other tasks, Alabama no longer has the "procedures and ability" for annual inspections. The record does not show, however, that Alabama is unwilling or incapable of conducting annual inspections. Nor is there an indication that annual inspections are required. Presumably, if the EPA reinstated annual inspections as a policy goal, then the state would, or could, simply divert resources back to inspections. Thus, the agency's determination that this ground

---

[5]    The Court notes that there is no evidence in the record that Alabama's NPDES permit program board members voted on conflicted matters.

23

does not warrant commencing withdrawal proceedings was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

### E. Lawsuit Limitations

Finally, Petitioners argue that Alabama's program fails to comply with the regulation requiring that the state be able to

> assess or sue to recover in court civil penalties and to seek criminal remedies, including fines, . . . for the violation of any NPDES permit condition; any NPDES filing requirement, any duty to allow or carry out inspection, entry or monitoring activities; or, any regulation or orders issued by the State Director.

40 C.F.R. § 123.27(a)(3)(i). Alabama can "assess or sue" in this manner, except as it relates to its state agencies, which have not waived—and under the Alabama Constitution may not waive—sovereign immunity in the courts. See id. § 123.27(a); Ala. Const. 1901, art. I, § 14.

The EPA acknowledges that sovereign immunity prevents ADEM from suing its state agencies or entities. Nonetheless, the EPA argues that neither the statute nor regulation requires the waiver of sovereign immunity. Petitioners, on the other hand, argue that per the regulation's plain language, the state must be able to sue to recover penalties for any violation.

The EPA maintains that state agency violations can be abated through citizen and federal enforcement and that Alabama's sovereign immunity is not reason

24

enough to commence withdrawal proceedings. The EPA further notes that Petitioners' preferred reading of the statute would raise a "serious constitutional question" because it would force states to sacrifice their immunity. Petitioners, in turn, contend that because the agency did not specifically rely on this basis to deny commencing withdrawal proceedings, it is an inappropriate ground on which to affirm the agency's determination.

It is not clear that the EPA can force states to sacrifice sovereign immunity without a clear statement from Congress to that effect. Nevertheless, when possible, the Court should avoid a serious constitutional question. See Clark v. Martinez, 543 U.S. 371, 380–81 (2005) ("[A] court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant . . . ."). As Congress has not explicitly required states to waive sovereign immunity in exchange for operating NDPES permit programs, and as the regulations are silent as to sovereign immunity, the Court concludes that the agency's interpretation is a reasonable one. Auer, 519 U.S. at 461. And, as with the other grounds, the agency's interpretation of this regulation was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

25

* * *

The EPA's discretion is not unlimited, but neither is it as constrained as Petitioners would suggest. The agency must faithfully administer the CWA and its implementing regulations, but its decision to commence withdrawal proceedings is largely a discretionary one. For the four alleged violations, the Court finds that the EPA reasonably construed the statutory and regulatory text. The Court also finds that the EPA's decision not to commence withdrawal proceedings in the face of these alleged violations was not arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with the law.

**AFFIRMED.**

26